

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-1995

# Davin v Dept of Justice

Precedential or Non-Precedential:

Docket 94-3590

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Davin v Dept of Justice" (1995). *1995 Decisions.* Paper 203.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/203

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-3590


ERIC DAVIN,
                    Appellant
          v.

UNITED STATES DEPARTMENT OF JUSTICE,
FEDERAL BUREAU OF INVESTIGATION


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 92-cv-01122)


Argued May 16, 1995
BEFORE:  COWEN, LEWIS and GARTH
         Circuit Judges

(Filed  August 1, l995 )

Marketa Sims (argued)
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA 15219-1886

          COUNSEL FOR APPELLANT
          ERIC DAVIN

Bonnie R. Schlueter
Michael L. Ivory (argued)
Office of United States Attorney
633 United States Post Office
 and Courthouse
Pittsburgh, PA  15219

          COUNSEL FOR APPELLEE
          U.S. DEPARTMENT OF JUSTICE,
          FEDERAL BUREAU OF INVESTIGATION

**OPINION**


1

COWEN, Circuit Judge.

Eric Davin appeals from the order of the district court granting summary judgment in favor of the United States Department of Justice, Federal Bureau of Investigation ("the FBI" or "the government") in a Freedom of Information Act ("FOIA") action. In response to a FOIA request by Davin, the FBI submitted to the district court a Vaughn index that set forth coded justifications and corresponding explanations for its withholding of approximately 7,400 pages of information. Because the Vaughn index submitted by the government did not sufficiently describe the information withheld, the district court did not have an adequate factual basis for determining whether the claimed exemptions applied to the individual documents. Accordingly, we will reverse the order of the district court and remand this matter for further determinations consistent with principles articulated in this opinion.

I.

Davin is a graduate history student at the University of Pittsburgh in the field of labor history. In order to complete his doctoral dissertation, in April 1986 Davin filed a FOIA request with the FBI seeking "a complete and thorough search of all filing systems and locations for all records . . . pertaining to David Lasser and The Workers Alliance of America." App. at 99 (emphasis in original). The Workers Alliance of

2

America ("WAA") was a nationwide organization representing the interests of thousands of unemployed individuals during the 1930's and 1940's. For a time, the WAA was headed by David Lasser. Because the WAA did not keep minutes of its meetings, there are no other archives of information on its activities. Lasser, who is now in his nineties, has provided the FBI with a letter authorizing release of his files.

The WAA was investigated by the FBI during the 1930's after the FBI received information that the organization was a front for the Communist Party of America. The purpose of the investigation was to determine the extent of Communist influence, and the identity of WAA members who were members of the Communist Party at the time. The FBI also investigated Lasser. According to the FBI, Communists had captured positions of control within the WAA by 1936. In 1940, Lasser resigned, claiming the WAA was a front organization for the Communist Party.

In response to Davin's request, the FBI located nine relevant files at either national headquarters or at the New York field office. The FBI described the files as follows:

> FBIHQ main file, 61-7586, (45 sections) corresponds to NYFO main file, 100-3638, (6 sections). Both files pertain to an internal security investigation and were compiled for law enforcement purposes. A 61 classification is entitled "Treason or Misprision of Treason" and involves violations of Title 18, U.S.C., Sections 2381, 2382, 2389, 2390, 756 and 757. A 100 classification is entitled "Domestic Security" and covers investigations by the FBI in the domestic security field; e.g., Smith Act violations. The Attorney General declared WAA to be within the purview of

3

Executive Order 9835, and later Executive Order 10450.  The first serial is dated March 5, 1936, and the last serial is dated October 21, 1960. . . .
FBIHQ main file, 124-2592 is a loyalty investigation of David Lasser consisting of two sections.  This classification covers security and loyalty investigations of personnel employed by or under consideration of employment with the European Recovery Program.  Investigation was conducted under Public Law 472, 80th Congress.  The first serial in this file is dated January 25, 1949, and the last serial is dated October 29, 1951.

FBIHQ main file 121-413, (Loyalty of Government Employees) consisting of one section, pertains to a preliminary inquiry to ascertain if David Lasser was associated with the Communist Party or its front organizations.  Investigation of David Lasser under the provision of Executive Order 9835 . . . was instituted by the FBI on April 22, 1948.  The first serial of this file is dated October 24, 1947, and the last serial is dated October 30, 1963.

FBIHQ main file, 151-748 involves one section.  This classification covers referrals from the Office of Personnel Management where an allegation has been received regarding an applicant's loyalty to the U.S. Government.  The Agency for International Development had requested the FBI to conduct a full field investigation under the provisions of Public Law 298, The Foreign Assistance Act of 1961, as amended. David Lasser was interviewed by the FBI in 1963 under the provisions of Executive Order 10450 . . . .  The first serial is dated December 12, 1963, and the last serial in this file is dated January 29, 1976.

FBIHQ main file, 126-706 consists of one section concerning a name check request on David Lasser for clearance for access to highly classified material by National Security Resources Board.  This classification covers background

4

investigation conducted on individuals who are to be assigned to duties under the International Development Program. The first and last serials are dated November 14, 1950, and November 15, 1950, respectively.

FBIHQ main file 65-66314, (Espionage) consisting of one section which contains documentation based on information received concerning the possibility that David Lasser could be some individual who could divert information to the detriment of the defense of the United States. No investigation was conducted. This file was opened on September 22, 1960 and closed on September 27, 1960.

FBIHQ main file, 47-13920 is a two-page file which contains information that a representative of WAA had made a claim that he had authority from the Federal Government to represent individuals in claims of various municipalities. This file was opened and closed on February 19, 1938. This classification is entitled "Impersonation" and covers violations of Title 18, U.S.C., Sections 912, 913, 915, and 916.

FBIHQ main file, 61-10652 (two sections) was initially compiled to determine if David Lasser might act as an informant for the FBI or if he would be willing to supply details concerning Communist Party activities in WAA. The first serial of this file is dated June 20, 1940, and the last document in the file is dated February 8, 1951.

Declaration of Special Agent Robert A. Moran, App. at 60-63 (footnotes omitted) [hereinafter all citations to the Appendix refer to the Moran declaration].

The FBI asserts that its records relating to the WAA total approximately 9,200 pages and its records on David Lasser contain approximately 1,200 pages. As of May 18, 1991, the FBI had released to Davin only 113 pages regarding the WAA and 150 pages on Lasser.

5

In April 1992, Davin filed a complaint for injunctive relief demanding the production of the documents. Subsequently, pursuant to an agreement between the parties, Davin and the government submitted a joint motion to stay the case for 130 days to permit the government to submit a Vaughn index.[1] This motion stipulated that the FBI had reviewed 6,889 documents pursuant to Davin's FOIA request, had released 2,970 pages to Davin, and claimed exemptions to the remaining 3,919 pages. The joint motion further provided that the government would select approximately 500 documents (roughly every fourteenth or fifteenth page), compile a Vaughn index and submit it to the court with a motion for summary judgment.

Included in the government's subsequent motion for summary judgment was a declaration by FBI Special Agent Robert Moran. The purpose of Moran's declaration was to provide the court and Davin with a description of the material being withheld and justifications for the government's assertions of FOIA exemptions to withhold certain information contained in the records. The declaration consisted of correspondences concerning Davin's request, an explanation of the FBI's central records system and electronic surveillance index, a list of records pertaining to Davin's request, a sampling and definition of

---

[1] A Vaughn index is an index correlating each withheld document, or a portion thereof, with a specific exemption and relevant part of an agency's justification for nondisclosure. The Vaughn index is a tool designed to aid the court in determining whether the agency has properly withheld the information requested. See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973) (Vaughn I), cert. denied, 415 U.S. 977, 94 S. Ct. 1564 (1974).

6

documents, a detailed explanation of the coded format used for justification of deleted material, and the justification for redacted materials.

A sampling of 500 pages was selected from the files. Each page was identified with a document number and indicated the file from which it came. An explanation of the types of documents in the sampling was also supplied. Portions of the documents were redacted. Located in proximity to the redacted material was a series of letters and numbers which corresponded to specific FOIA exemptions. In those instances where an entire page was redacted, justification code numbers for the withholding were substituted for the deleted page.

To determine the pertinent justification for deleted material on each processed document, the reader would refer to the document in question, note the code number adjacent to the deleted material and refer to the corresponding code categories. The memorandum then listed twenty-seven justification categories for withholding information, along with an explanation of the various categories.

Moran's declaration listed the FBI Main Files regarding Lasser and the WAA, but did not contain any factual description of the specific documents and portions of the documents withheld. Instead, Special Agent Moran offered generic explanations of the "justification categories" used to encode the Vaughn index. No specific index was created to factually link the generic descriptions with the encoded deletions, and the explanations themselves did not refer to Lasser or the WAA or any other fact

7

connected with this action. No attempt was made to provide an individual rationale for the withholding of specific information.

The government asserted that of the 10,400 pages identified (9,200 on the WAA and 1,200 on Lasser), 2,970 had been released to Davin and that the remaining pages were being withheld under the following FOIA exemptions: (1) Category (b)(7)(C) Unwarranted Invasion of Personal Privacy; (2) Category (b)(7)(D) Confidential Source Material; (3) Category (b)(7)(E) Investigative Techniques and Procedures; and (4) Category (b)(2) Information related Solely to the Internal Personnel Rules and Practices of an Agency.

Following receipt of the declaration and exhibits, Davin filed a motion to compel production of documents for in camera review, arguing that the district court could not make an accurate determination of the validity of the redactions based upon the government's Vaughn index without review of the documents. Davin asserted that the government had failed to provide any factual information describing the individual documents withheld and thus failed to demonstrate the applicability of the exemptions it claimed.

The district court ordered an evidentiary hearing in which Agent Moran testified about twenty-five of the approximately 7,400 documents that had been withheld. These documents were selected by Davin from the "Treason or Misprision of Treason" file. Twenty-two of these pages were blackened out in their entirety. Agent Moran described the various categories

8

under which the documents were withheld, although he did not testify to the contents of the withheld documents themselves.

The district court held that Agent Moran's testimony, together with the Vaughn index, demonstrated with "reasonable specificity" why the documents were exempt from disclosure. Accordingly, the district court granted the government's motion for summary judgment and denied Davin's motion to compel in camera examination. This appeal followed.

II.

A two-tiered test governs our review of an order of the district court granting summary judgment in proceedings seeking disclosure of information under FOIA. We must "first decide whether the district court had an adequate factual basis for its determination." McDonnell v. United States, 4 F.3d 1227, 1242 (3d Cir. 1993) (citing Patterson by Patterson v. FBI, 893 F.2d 595, 600 (3d Cir.), cert. denied, 498 U.S. 812, 111 S. Ct. 48 (1990)). This review is de novo and requires us to examine the affidavits below to determine "whether the agency's explanation was full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." Id. (quoting King v. Department of Justice, 830 F.2d 210, 217-18 (D.C. Cir. 1987)).

9

After reviewing the affidavits, "[i]f this Court concludes that the affidavits presented a sufficient factual basis for the district court's determination, it must then decide whether that determination was clearly erroneous." Id. (citations omitted). Factual findings are clearly erroneous "'if the findings are unsupported by substantial evidence, lack adequate evidentiary support in the record, are against the clear weight of the evidence or where the district court has misapprehended the weight of the evidence.'" Id. (quoting Lame v. Department of Justice, 767 F.2d 66, 70 (3d Cir. 1985) (Lame II)).

The district court exercised jurisdiction in this matter pursuant to 5 U.S.C. § 552(a)(4)(B) (1988) and 28 U.S.C. §1331 (1988). Our jurisdiction in this appeal rests on 28 U.S.C. § 1291 (1988).


III.

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, in order "to facilitate public access to Government documents." United States Dep't of State v. Ray, 502 U.S. 164, 173, 112 S. Ct. 541, 547 (1991). Premised on the belief that "an informed electorate is vital to the proper operation of a democracy," FOIA was intended to create an expedient tool for disseminating information and holding the government accountable. Coastal States Gas Corp. v. Department of Energy, 644 F.2d 969, 974 (3d Cir. 1981) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 3 (1965)). Consistent with this purpose, FOIA requires

10

governmental agencies to make promptly available any records requested unless the requested information is exempt from disclosure under one of the nine specific exemptions set forth in the FOIA statute itself.  5 U.S.C. § 552(b) (1988 & Supp. V 1993).

The Act creates a strong presumption in favor of disclosure, Department of Air Force v. Rose, 425 U.S. 352, 361, 96 S. Ct. 1595, 1599 (1976), and requires the district court to conduct a de novo review of a government agency's determination to withhold requested information.  5 U.S.C. § 552(a)(4)(B).  The agency has the burden of showing that a statutory exemption applies.  Id.  Moreover, any reasonably segregable portion of a record must be made available to the person requesting the record.  5 U.S.C. § 552(b).

The review of FOIA cases "is made difficult by the fact that the party seeking disclosure does not know the contents of the information sought and is, therefore, helpless to contradict the government's description of the information or effectively assist the trial judge." Ferri v. Bell, 645 F.2d 1213, 1222 (3d Cir. 1981), modified, 671 F.2d 769 (3d Cir. 1992).  In order to "transform a potentially ineffective, inquisitorial proceeding against an agency that controls information into a meaningful adversarial process," the reviewing court may order the government to prepare a "Vaughn" index, identifying each document withheld, the statutory exemption claimed, and a particularized description of how each document withheld falls within a statutory exemption. Coastal States, 644 F.2d at 984.  We have

11

adopted the principles and procedures outlined in <u>Vaughn</u>.  <u>See</u>,
<u>e.g.</u>, <u>Ferri</u>, 645 F.2d at 1222 & n.11.

The function of a <u>Vaughn</u> index and public affidavit is
to establish a detailed factual basis for application of the
claimed FOIA exemptions to each of the documents withheld.  In
<u>McDonnell v. United States</u>, 4 F.3d 1227 (3d Cir. 1993), we
explained:

> The significance of agency affidavits in a
> FOIA case cannot be underestimated . . . .
> Affidavits submitted by a governmental agency
> in justification for its exemption claims
> must therefore strive to correct, however
> imperfectly, the asymmetrical distribution of
> knowledge that characterizes FOIA litigation.
> The detailed public index which in <u>Vaughn</u> we
> required of withholding agencies is intended
> to do just that . . . .  Thus, when an agency
> seeks to withhold information, it must
> provide "a relatively detailed justification,
> specifically identifying the reasons why a
> particular exemption is relevant and
> correlating those claims with the particular
> part of a withheld document to which they
> apply."

<u>Id.</u> at 1241 (quoting <u>King</u>, 830 F.2d at 218-19).

While there is no set formula for a <u>Vaughn</u> index, the
hallmark test is "that the requester and the trial judge be able
to derive from the index a clear explanation of why each document
or portion of a document withheld is putatively exempt from
disclosure."  <u>Hinton v. Department of Justice</u>, 844 F.2d 126, 129
(3d Cir. 1988).  An agency is entitled to summary judgment when
the agency's affidavits:

> describe the withheld information and the
> justification for withholding with reasonable
> specificity, demonstrating a logical
> connection between the information and the

12

> claimed exemption . . ., and are not
> controverted by either contrary evidence in
> the record nor by evidence of agency bad
> faith.

American Friends Serv. Comm. v. Department of Defense, 831 F.2d 441, 444 (3d Cir. 1987) (quoting Abbotts v. Nuclear Regulatory Comm., 766 F.2d 604, 606 (D.C. Cir. 1985) (internal quotations and citations omitted)).

A.

The fundamental inquiry in this case centers on whether the "categorical" method of indexing utilized by the government constitutes an adequate Vaughn index. The government offered the declaration of Agent Moran as its Vaughn index. The Moran declaration described the FBI's generalized FOIA procedures, including a summary of exemption "justification categories." It set forth a detailed explanation of the justification categories used to redact the material included in the declaration. Each justification category was denoted by a three or four letter code. These codes appeared next to the redacted portions of the exhibits. The government maintains that this declaration, in conjunction with Agent Moran's testimony, was a sufficiently adequate Vaughn index that permitted the district court to review all of the exemption claims advanced.

In its brief the government provided representative examples of the categorical indexing method it used. For instance, the declaration explained that code "b7D-3" appearing next to the first redacted paragraph means that the information

13

was withheld because it was provided to the FBI by a source who had "received an express promise that it would be held in confidence" and contained information that could lead to the source's identity. App. at 87. The declaration further explained that disclosure had the potential of causing "great harm to the source," and of harming the FBI because of the "chilling effect on the activities and cooperation of other sources." App. at 88. As a second example, the government demonstrated that the list of names and addresses provided by the confidential source were withheld under category "b7C-6." The declaration explained that this category means that the information was withheld to prevent an unwarranted invasion of privacy of the individuals named, since disclosure could "announce to the world that they were of investigative interest to the FBI and therefore permit derogatory inferences to be made therefrom." App. at 79.

The government asserts that the use of a coded index system sufficiently fulfills the functions served by the classic Vaughn index, but in a more efficient and clear manner. Davin argues that such a categorical approach, without the inclusion of specific factual information that correlates the claimed exemptions to the withheld documents, is not a sufficient Vaughn index. We agree with Davin.

In McDonnell we held that in order for the FBI to fulfill its burden to establish that materials withheld are exempt from FOIA, "[t]he agency may meet this burden by filing affidavits describing the material withheld and detailing why it

14

fits within the claimed exemption."  McDonnell, 4 F.3d at 1241 (emphasis added) (citing King, 830 F.2d at 217-18).  See also Lame v. United States Dep't of Justice, 654 F.2d 917, 928 (3d Cir. 1981) (Lame I) (the district court "should have had an explanation by the FBI of why in each case disclosure would result in embarrassment or harassment either to the individual interviewed or to third parties" (emphasis added)).  This precedent requires that the agency provide the "connective tissue" between the document, the deletion, the exemption and the explanation.  It is insufficient for the agency to simply cite categorical codes, and then provide a generic explanation of what the codes signify.  See King, 830 F.2d at 223-34 ("A withholding agency must describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of disclosing the sought-after information. . . . Categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." (emphasis in original)(footnote omitted)).

In the case at hand, the government's references to causing "great harm to the source," App. at 88, and to the possibility that disclosure could "announce to the world that they were of investigative interest to the FBI and therefore permit derogatory inferences to be made therefrom," App. at 79, are generic explanations broad enough to apply to any FOIA request.  They are not tied to the content of the specific redactions.  The justification codes and the explanations offered by the government lack an explanation of how the release of the

15

information would violate the privacy interests and pose potential risk to certain individuals. Moreover, throughout his testimony, Agent Moran reiterated the broad categorical explanations recited in his declaration; he did not refer to specific facts. Thus, Agent Moran's testimony sheds no new light on the government's reasons for nondisclosure.

While the use of the categorical method does not per se render a Vaughn index inadequate, an agency using justification codes must also include specific factual information concerning the documents withheld and correlate the claimed exemptions to the withheld documents. Compare Keys v. United States Dep't of Justice, 830 F.2d 337, 350 (D.C. Cir. 1987) (upholding use of indexing system where "the affidavit placed each document into its historical and investigative context") with King, 830 F.2d at 221 (similar coding system found wanting "because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety") and Wiener v. FBI, 943 F.2d 972, 978-79 (9th Cir. 1991) ("boilerplate" explanations of coded index found inadequate since "[n]o effort is made to tailor the explanation to the specific document withheld"), cert. denied, __ U.S. __, 112 S. Ct. 3013 (1992). As the Court of Appeals for the D.C. Circuit warned: "the goal of descriptive accuracy is not to be sacrificed to the niceties of a particular classification scheme." King, 830 F.2d at 225. Thus, "a coding system might be employed to indicate applicability of a given response to more than one segment of redacted material," but only "so long as the information supplied remains responsive

16

to each deleted segment without becoming categorical in tenor."
Id. at 224 (emphasis added).

The Vaughn index provided by the government affords Davin little or no meaningful opportunity to argue for release of particular documents.  Indeed, the index provides no information about particular documents that might be useful in evaluating the propriety of the decision to withhold.  Because of the paucity of factual information related to the district court, the categorical justification codes could not provide a sufficient factual basis from which the district court could make its determination.  Accordingly, on the record before us, we hold that the district court could not fulfill its duty of ruling on the applicability of the claimed exemptions on the basis of the coded indexing system utilized by the government for its Vaughn index.

B.

Davin further contends that the district court erred in failing to require the FBI to release all reasonably segregable portions of the sample documents.  Davin also maintains that the FBI is required under FOIA to provide him with all reasonably segregable material of all the 10,000 pages of material, not just the sampled material.  FOIA mandates that "[a]ny reasonable segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  In determining segregability, courts must construe the exemptions

17

narrowly with the emphasis on disclosure. <u>Wightman v. Bureau of Alcohol, Tobacco & Firearms</u>, 755 F.2d 979, 982 (1st Cir. 1985). The district court found that the FBI complied with its obligation.

It is the agency's burden to prove that the withheld portions are not segregable from the non-exempt material. 5 U.S.C. § 552(a)(4)(B). In the case at bar, the only evidence submitted by the government in support of its position was Agent Moran's conclusory statement that "[e]very effort has been made to provide the plaintiff with all reasonably segregable portions on [sic] the sampled material." App. at 67. Nowhere in Moran's declaration did he describe the process by which he determined that all reasonably segregable material of each of the withheld documents or portions of documents had been released. Nor did the government provide a factual recitation of why certain materials are not reasonably segregable.

In its brief the government points, as an example, to Exhibits C-1 through C-7 which Agent Moran explained had been provided by a source under the express promise of confidentiality. Government's Brief at 19-20. According to the government, these documents contained a narrative in which a number of individuals involved with the WAA were named. Exhibit C-1 bore two coded references: "b7C-6" and "b7D-3." The government explained that category b7C-6 refers to the names of individuals who are of investigative interest to the FBI. According to Moran's declaration, the release of this information would constitute an unwarranted invasion of privacy. App. at 79-

18

80. Category b7D-3 indicates that the information was provided by an individual who had received an express promise of confidentiality. App. at 87. The government notes that a portion of C-8 was released because the identity of the confidential source could not be ascertained.

This representative example provided by the government itself, as an illustration of its proper efforts to provide Davin with all reasonably segregable information, in fact reflects the inadequacy of the government's efforts. The government fails to indicate why the privacy interests at stake could not be protected simply by redacting particular identifying information. Without some further elaboration of the document's contents, Davin is unable to dispute the FBI's assertion that more information is not segregable. Cf. Church of Scientology Int'l v. United States Dep't of Justice, 30 F.3d 224, 232 n.11 (1st Cir. 1994) (the government "needs to provide more than [an] unsupported conclusion to justify withholding the whole document. Is the document full of personal anecdotes, whose perspective would tend to reveal the declarant, thus supporting this conclusion? Or does the document simply give one individual's description of the way the Church generally treats members, and thus arguably include material that could be segregated from the identifying information?").

The Moran declaration is comprised of assertions that documents were withheld because they contain the type of information generally protected by a particular exemption. The statements regarding segregability are wholly conclusory,

19

providing no information that would enable Davin to evaluate the
FBI's decisions to withhold.  On remand, the government must
provide an adequate factual basis for the district court to
determine whether Davin has been afforded all reasonably
segregable information.[2]

Furthermore, the government must provide Davin with all
reasonably segregable non-exempt information, not just the non-
exempt information found in the sampled documents.  The
government maintains that it is only required to produce all
reasonably segregable material from the sampled material.  It
claims that because Davin agreed to a representative sampling of
approximately 500 pages of the 6,689 documents selected he
"should abide by his decision."  Government's Brief at 19.

---

[2]In addition to making findings without sufficient evidentiary
support, the district court may have also erred in holding that
more information was not reasonably segregable.  Although our
scope of review on appeal is limited in this context, see
McDonnell, 4 F.3d at 1242, it appears that certain information
could be disclosed without jeopardizing possibly exempt
information.  We note the colloquy between Agent Moran and
counsel for Davin regarding the deletions of certain headings in
the table of contents of a 200 page report.  Agent Moran
testified that the deletions did not contain the name of a
confidential source or confidential information, but rather the
headings were redacted "because some of the information would
indicate possibly a particular area of the country" from where
the informant was operating and might, therefore, lead the
requester back to the identity of a particular confidential
source.  App. at 618.  We do not find it likely that a reference
to a particular "area of the country" would lead to the identity
of individuals who were given promises of confidentiality.  On
remand, if after receiving a sufficient factual basis the court
determines that certain information is exempt from disclosure,
the district court should reexamine whether seemingly non-
identifying information such as this geographical information
should also be withheld.

20

The purpose of the Vaughn index is to help specify in a large document which portions of the document are disclosable and which are allegedly exempt. Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973) (Vaughn I), cert. denied, 415 U.S. 977, 94 S. Ct. 1564 (1974). The indexing system "subdivide[s] the document under consideration into manageable parts," so that once the issues are focused, the reviewing court will have an easier task "rul[ing] on each element of the itemized list" than it would if the "agency were permitted to make a generalized argument in favor of exemption." Id.

Courts have upheld the use of a representative sample, such as the sample stipulated to in this case. See, e.g., Weisberg v. United States Dep't of Justice, 745 F.2d 1476, 1490 (D.C. Cir. 1984); Vaughn v. Rosen, 523 F.2d 1136, 1140 (D.C. Cir. 1975) (Vaughn II). Nevertheless, any decision as to those documents is applicable to all of the documents at issue. See Vaughn II, 523 F.2d at 1140 (noting that parties stipulated that any decision regarding the representative sample is applicable to all of the documents). Accordingly, on remand the district court should reexamine the material in the sample, and any rulings it makes regarding those materials must then be applied to the entire body of the requested information. The government is then obligated to provide Davin all the reasonably segregable material of all the 10,000 pages requested, based upon the district court's ruling.

These two holdings regarding general deficiencies in the government's Vaughn index alone require reversal of the

21

district court's order and remand for further fact finding. However, because on remand the district court may reach determinations of specific exemptions, we find it instructive to clarify certain contested issues and delineate the proper legal standards for future resolution.

## IV.

For the majority of the withheld information, the government has claimed exemptions under 5 U.S.C. § 552(b)(7), which applies to records or information compiled for law enforcement purposes. Section 552(b)(7) provides, in relevant part, that the following is exempt from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, . . . which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law . . . . .

5 U.S.C. § 552(b)(7) (1988 & Supp. V 1993). Thus, in order to prevail on an Exemption 7 claim, the government must bear its burden of demonstrating for every record that: (1) the

22

information the FBI seeks to conceal was "compiled for law enforcement purposes," and (2) disclosure would produce one of the specified harms enumerated in the statute. <u>United States Dep't of Justice v. Landano</u>, __ U.S. __, __, 113 S. Ct. 2014, 2019 (1993); <u>Federal Bureau of Investigation v. Abramson</u>, 456 U.S. 615, 622, 102 S. Ct. 2054, 2059-60 (1982).

A.

In reviewing the government's withholding of records under any subsection of § 552(b)(7), the district court must first be satisfied that those materials qualify as "records or information compiled for law enforcement purposes."[3] There is disagreement among the courts of appeals about how to make this threshold determination.

---

[3] While the focus of this case is upon documents compiled for putative <u>criminal investigations</u>, we note that "records or information compiled for law enforcement purposes" are not limited to records or information compiled for criminal investigations. While criminal investigation is certainly one law enforcement purpose, there are also additional law enforcement purposes which are not necessarily criminal in nature. Indeed, the statute itself treats both "criminal investigation[s]" and "national security intelligence investigation[s]" as subsets of law enforcement records in Exemption 7(D). Thus, other agencies that have some law enforcement duties, such as the Equal Employment Opportunity Commission in investigating violations of Title VII, the Internal Revenue Service in enforcing the tax laws, and the National Labor Relations Board in conducting unfair labor practice proceedings, may also justify withholding information under Exemption 7. Note, however, that an agency whose principal function is not law enforcement bears the burden of proving that "the records it seeks to shelter under Exemption 7 were compiled for adjudicatory or enforcement purposes." <u>Stern v. FBI</u>, 737 F.2d 84, 88 (D.C. Cir. 1984); <u>see</u> <u>also</u> <u>infra</u> at __ [typescript at 26-28] (discussing <u>Committee on Masonic Homes v. NLRB</u>, 556 F.2d 214, 218-19 (3d Cir. 1977)).

The government suggests that we follow the courts who have adopted a per se rule, under which all records compiled by law enforcement agencies such as the FBI qualify as "records compiled for law enforcement purposes" pursuant to the (b)(7) exception. See Jones v. Federal Bureau of Investigation, 41 F.3d 238, 245-46 (6th Cir. 1994) (determining that the per se rule comports more fully with the policies Congress enacted in FOIA); Ferguson v. FBI, 957 F.2d 1059, 1070 (2d Cir. 1992) (district court should not engage in factual inquiry as to legitimacy of law enforcement purpose); Curran v. Department of Justice, 813 F.2d 473, 475 (1st Cir. 1987) ("[T]he investigatory records of law enforcement agencies are inherently records compiled for 'law enforcement purposes' within the meaning of Exemption 7." (citation omitted)); Kuehnert v. FBI, 620 F.2d 662, 666 (8th Cir. 1980) (a showing of law enforcement purpose of a particular investigation is not a precondition to FBI's invocation of Exemption 7).

In contrast, the Court of Appeals for the District of Columbia Circuit has rejected a per se rule, and adopted a two-part test that must be satisfied in order for a law enforcement agency to pass the Exemption 7 threshold. See Pratt v. Webster, 673 F.2d 408 (D.C. Cir. 1982). In Pratt, the court described the two "critical conditions" of what has been named the "rational nexus" rule:

> First, the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security. To satisfy this requirement of a "nexus," the

24

agency should be able to identify a particular individual or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law. The possible violation or security risk is necessary to establish that the agency acted within its principal function of law enforcement, rather than merely engaging in a general monitoring of private individuals' activities. . . .

Second, the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least "a colorable claim" of its rationality. . . . Such an agency, in order to carry out its functions, often must act upon unverified tips and suspicions based upon mere tidbits of information. A court, therefore, should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision. Nor is it necessary for the investigation to lead to a criminal prosecution or other enforcement proceeding in order to satisfy the "law enforcement purpose" criterion. . . .

Thus, . . . [i]n order to pass the FOIA Exemption 7 threshold, such an agency must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached. Either of these concerns must have some plausible basis and have a rational connection to the object of the agency's investigation.

Pratt, 673 F.2d at 420-21 (emphasis in the original) (citations and footnotes omitted). See also King, 830 F.2d at 229 (FBI records are not deemed law enforcement records simply by virtue of the function that the FBI serves, but rather the two-prong Pratt test must be applied to determine the threshold showing

25

requisite). The Court of Appeals for the Ninth Circuit has also adopted a "rational nexus" standard. See, e.g., Wiener, 943 F.2d at 985 ("No withholding under any of the exemptions listed in section 552(b)(7) is valid unless the withholding agency establishes a '"rational nexus" between its law enforcement duties and the document for which Exemption 7 is claimed.'" (citations omitted)).

We have not directly ruled on what must be established in order to meet the threshold requirement. We find, however, some guidance from our prior precedents. In Committee on Masonic Homes v. NLRB, 556 F.2d 214 (3d Cir. 1977), an employer had requested from the National Labor Relations Board ("NLRB") all union authorization cards that had been submitted by the union as evidence of support. The NLRB claimed that the cards were exempt from disclosure under Exemption 7. The NLRB argued that it had an enforcement purpose -- enforcing the National Labor Relations Act -- for which the union authorization cards under question were compiled. We held that under the circumstances of that case, there was no "law enforcement purpose" pursuant to Exemption 7, because "'law enforcement purposes' must relate to some type of formal proceedings, and one that is pending." Id. at 219; see also Ferri, 645 F.2d at 1223 ("[T]he 'investigatory records' exemption is to be construed literally. It contemplates files compiled with a specific, formal proceeding or investigation in mind.").

The precedential force of Masonic Homes can be questioned for two reasons. First, we decided Masonic Homes

prior to the 1986 Amendment to FOIA that replaced the language "investigatory records compiled for law enforcement purposes," with the present language of § 552(b)(7), "records or information compiled for law enforcement purposes." This amended language can appear to have been intended to broaden the exemption's reach. We learn from the legislative history, however, that Congress' action was not intended to modify the threshold showing of law-enforcement purpose. The report of the Senate Judiciary Committee on S. 774, 98th Cong., 1st Sess. (1983), stated that the amendment "does not affect the threshold question of whether 'records or information' withheld under (b)(7) were 'compiled for law enforcement purposes.' This standard would still have to be satisfied in order to claim the protection of the (b)(7) exemption." S. Rep. No. 221, 98th Cong., 1st Sess. 23 (1983), reprinted in relevant part in, 132 Cong. Rec. H9466 (daily ed. Oct. 8, 1986); see King, 830 F.2d at 229 n.141 (providing detailed legislative history of the 1986 Amendment to Exemption 7). Accordingly, we can be assured that our holding in Masonic Homes has not been undercut by legislative fiat.

Second, because the withholding agency in Masonic Homes was the NLRB, it is unclear whether our conclusion that "law enforcement purposes" must relate to some type of formal enforcement proceeding, has an application to an agency whose principal function is criminal law enforcement. See Pratt, 673 F.2d at 421 n.33 ("We believe that the Third Circuit's conclusion that '"law enforcement purposes" must relate to some type of enforcement proceeding, and one that is pending,' has no

27

application to an agency whose principal function is criminal law enforcement.  Therefore, we also dismiss the First Circuit's concern . . . that the need to shield legitimate law enforcement efforts from harmful FOIA disclosures might lead to frivolous prosecutions." (citations omitted)).

While we are not bound to extend our holding in Masonic Homes to a law enforcement agency such as the FBI, at minimum, our statements in Masonic Homes indicate a rejection of a per se rule.  Accordingly, we must devise a test to apply to law enforcement agencies that requires the agency to sustain its burden of establishing the threshold element of Exemption 7.

We believe the preferable test is an adaptation of the two-prong "rational nexus" test articulated by the Court of Appeals for the District of Columbia Circuit in Pratt.  Under this test, the government must identify a particular individual or incident as the object of the investigation and specify the connection of the individual or incident to a potential violation of law or security risk.  The agency must then demonstrate that this relationship is based upon information "sufficient to support at least a 'colorable claim' of its rationality."  Pratt, 673 F.2d at 421.

The D.C. Circuit has explained that the threshold showing required by Pratt is an "objective" one, and "suffices to establish the exemption only if it is unrefuted by persuasive evidence that in fact another, nonqualifying reason prompted the investigation," such as where an investigation is conducted "for

28

purposes of harassment." Shaw v. FBI, 749 F.2d 58, 63-64 (D.C. Cir. 1984).

In the present case, the FBI submitted a description of the nine files pertaining to Davin's FOIA request in the Moran declaration, as quoted above. See supra at __ [typescript at 3-5]. The declaration clearly identifies David Lasser and the WAA as the targets of the investigations, thereby fulfilling the first prong of the Pratt test. The declaration, however, plainly failed to specify the connection between Lasser and the WAA, and the possible security risk or violation of federal law.

As a preliminary matter, the declaration only contained a general description of the files and did not describe the nexus between each document and a particular investigation. Indeed, the government failed even to identify the investigations to which each document in the nine FBI files pertained.

Furthermore, the declaration does little more than cite to the criminal statutes, executive orders, and public laws pursuant to which the investigations were undertaken, "presumably indicating that somewhere within the parameters of these general provisions were criminal acts that the FBI suspected [Lasser and the WAA] of committing." King, 830 F.2d at 230. While the second prong inquiry is "necessarily deferential" to the agency, Pratt, 673 F.2d at 421, we believe that the simple recitation of statutes, orders and public laws is an insufficient showing of a rational nexus to a legitimate law enforcement concern. The FBI has failed to meet its burden in the district court because neither Agent Moran's declaration nor his testimony provide any

29

detail concerning the supposed law enforcement activities that generated each of the documents in the Vaughn index. The FBI must come forward with additional evidence to support its claim of a law enforcement purpose.

In addition, we note that even the skeletal descriptions of the files provided by Agent Moran cast doubt on the government's assertion that the files were related to a law enforcement purpose: while the nine files cover investigations spanning over forty years, the government has not pointed to a single arrest, indictment or conviction.

We acknowledge that the Supreme Court has indicated there is no requirement for the compilation of information to be effected by a specific time. See John Doe Agency v. John Doe Corp., 493 U.S. 146, 153, 110 S. Ct. 471, 476 (1989). Nor do we require evidence of an actual indictment or conviction in order for the government to fulfill its burden of proving that its investigation pertained to a law enforcement purpose. However, on the record before us, the government must allege additional specific facts that demonstrate "the agency was gathering information with the good faith belief that the subject may violate or has violated federal law," and was not "merely monitoring the subject for purposes unrelated to enforcement of the law." Lamont v. Department of Justice, 475 F. Supp. 761, 773 (S.D.N.Y. 1979) (citing, inter alia, Masonic Homes, 556 F.2d at 219). If the government's investigation did not ultimately result in any arrests, indictments or other proceedings, then the government may sustain its burden under § 552(b)(7) by explaining

30

why it decided not to follow through with the investigations. The Vaughn index in this case, however, provides Davin with no information whatsoever about the initiation, breadth or results of the investigations. The paucity of information about these lengthy investigations casts doubt on the government's assertion that withheld documents pertain to law enforcement investigations, and has made impossible Davin's challenge to the government's claim.

The Court of Appeals for the Ninth Circuit was faced with similar circumstances in Wiener, where the FBI refused to release files to a historian concerning political investigations of John Lennon. In that case, the FBI claimed Exemption 7, alleging that:

> John Lennon was under investigation for possible violations of the Civil Disobedience Act of 1968, 18 U.S.C. § 231 (1988), and the Anti-Riot Act, 18 U.S.C. § 2101 (1988), because of his association with a radical group known as the Election Year Strategy Information Center (EYSIC).

Wiener, 943 F.2d at 985-96. The court rejected the FBI's claims, holding that:

> The Civil Disobedience Act and the Anti-Riot Act are very broad criminal statutes, prohibiting a wide variety of conduct. Citations to these statues do little to inform Wiener of the claimed law enforcement purpose underlying the investigation of John Lennon. Without providing Wiener with further details of the kinds of criminal activity of which John Lennon was allegedly suspected, Wiener cannot effectively argue that the claimed law enforcement purpose was in effect a pretext.

31

Id. at 986.

The statutes that criminalize treason, misprision of treason, recruiting for service against the United States, and the other criminal activities that the FBI was "investigating" are no less broad than the Civil Disobedience Act or the Anti-Riot Act. The FBI's blanket references to these statutes do not adequately inform Davin of the claimed law enforcement purposes of the FBI investigation of the WAA and Lasser. Accordingly, on remand, the government must provide additional facts regarding the law enforcement investigations implicated by each of the documents withheld under any (b)(7) exemption.

### B.

If, on remand, the district court concludes that the government has demonstrated a rational nexus between its law enforcement duties and the particular document or portions withheld, then the district court will reach the specific exemptions of subsections of § 552(b)(7). The government asserts that information was exempt from disclosure under subsection (7)(C) Unwarranted Invasion of Personal Privacy, (7)(D) Confidential Source Material, and (7)(E) Investigative Techniques and Procedures. We will address each exemption seriatim.

### 1. § 552(b)(7)(C)

Exemption 7(C) permits withholding of records or information compiled for law enforcement purposes to the extent that production "could reasonably be expected to constitute an

32

unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(7)(C). Agent Moran identified nine privacy interests that implicated Exemption 7(C): (1) the identities or identifiers of FBI personnel; (2) the names and identifying data of financial institution or commercial enterprise employees; (3) identities of non-FBI federal government employees; (4) names and identifying data of non-federal government law enforcement officers; (5) names and identifying data of state and local government employees; (6) names and identifying data pertaining to third parties who were of investigative interest; (7) names and identifying data for third parties who were merely mentioned; (8) file numbers related to third parties; and (9) names and identifying information of individuals who provided information to the FBI.

We set forth the standards for evaluating a 7(C) claim in Lame I, where we held:

> The Section 7(C) privacy exemption does not prohibit all disclosures which invade personal privacy, but only disclosures which entail an unwarranted invasion of personal privacy . . . . "Exemption 7(C)'s protection of personal privacy is not absolute . . . . [T]he proper approach to [a] request under a privacy based exemption such as 7(C) is a de novo balancing test, weighing the privacy interest and the extent to which it is invaded on the one hand, against the public benefit that would result from disclosure, on the other."

Lame I, 654 F.2d at 922-23 (quoting Ferri, 645 F.2d at 1217). See also McDonnell, 4 F.3d at 1254.

33

### a. Privacy Interests

In <u>United States Dep't of Justice v. Reporters Comm.</u> <u>for Freedom of the Press</u>, 489 U.S. 749, 109 S. Ct. 1468 (1989), the Supreme Court provided guidance on the proper understanding of "privacy interest." Quoting from Webster's dictionary, the Court stated that information may be classified as "private" if it is "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." <u>Id.</u> at 763-64, 109 S. Ct. at 1477 (footnote omitted). We recognized in <u>Landano v. United States Dep't of Justice</u>, 956 F.2d 422, 426 (3d Cir. 1992), <u>vacated in part on other grounds and remanded</u>, __ U.S. __, 113 S. Ct. 2014 (1993), "that individuals involved in a criminal investigation -- including suspects, witnesses, interviewees, and investigators -- possess privacy interests, cognizable under Exemption 7(C), in not having their names revealed in connection with disclosure of the fact and subject matter of the investigation." <u>Id.</u> at 426 (citation omitted). Suspects, interviewees and witnesses have a privacy interest because disclosure may result in embarrassment or harassment. <u>Id.</u> Law enforcement personnel involved in a criminal investigation also have a cognizable privacy interest under FOIA. <u>Id.</u> (citing <u>Patterson</u>, 893 F.2d at 601).

Accordingly, the individuals involved in the investigations of David Lasser and the WAA have a privacy interest in not having their <u>identities</u> disclosed.[4] We note that

---

[4]We note again the colloquy between Agent Moran and counsel for Davin, in which Agent Moran concedes that certain information was

for some, the privacy interest may become diluted by the passage of time, though under certain circumstances the potential for embarrassment and harassment may also endure.  Id. at 427.  Thus, when balancing the private and public interests, the district court must determine the relative strength of an individual's privacy interest.

The government and Davin dispute whether death extinguishes an individual's privacy rights under FOIA, and if so, whether the government is required to determine if the individual is still alive.  The first issue has been settled by our holding in McDonnell, where we expressly announced that under § 552(b)(7)(C), "[p]ersons who are deceased have no privacy interest in nondisclosure of their identities."  McDonnell, 4 F.3d at 1257.  Furthermore, with regard to a claimed privacy exemption under § 552(b)(6), the exemption from disclosure of personnel and medical files, we directed the government to determine whether the subject of a FOIA request was deceased or living.  Id. at 1254.  While we recognize that the standard for evaluating privacy interests pursuant to Exemption 7(C) is somewhat broader that the standard for Exemption 6, see Reporters Committee, 489 U.S. at 756, 109 S. Ct. at 1473, we nonetheless do

---

redacted pursuant to Exemption 7(C) "[b]ecause some of the information would indicate possibly a particular area of the country" from where an informant was operating, which might lead the requester to the informant's identity.  App. at 618.  See supra note 2.  While the FBI may assert individuals' privacy interest in not having their identities disclosed, the privacy interest only extends to the individuals' names and street addresses, which need not be revealed, but not to cities, occupations, or other "identifiers."

35

not perceive legitimate grounds for distinguishing between (b)(6) and (b)(7)(C) on this issue.

The government voices a concern, however, that to require the FBI to determine whether all of the hundreds of individuals who are named in the files requested by Davin are alive "would place a great, if not intolerable burden, on the FBI." Government Brief at 33. We are mindful that the Supreme Court has recognized a congressional intent "to provide '"workable" rules' of FOIA disclosure." Landano, __ U.S. at __, 113 S. Ct. at 2023 (citations omitted). Accordingly, we hold that it is within the discretion of the district court to require an agency to demonstrate that the individuals upon whose behalf it claims the privacy exemption are, in fact, alive. In exercising its discretion, the district court should consider such factors as the number of named individuals that must be investigated, and the age of the requested records. If the number of individuals is not excessive, the agency could be required to determine whether the individuals are alive before asserting a privacy interest on their behalf. However, after a sufficient passage of time -- such as in our case where the pertinent investigations began over sixty years ago (and in McDonnell where the investigation began over seventy years before the FOIA request) -- the probability of the named individuals remaining alive diminishes. Under such circumstances, it would be unreasonable for the district court not to assume that many of the individuals named in the requested records have died, thereby negating a privacy interest unless proving otherwise.

36

                          b. Public Benefit

          The Reporters Committee decision also guides us in

identifying the relevant "public benefits" to be weighed against

the asserted privacy interests.  The Supreme Court declared that:
               whether disclosure of a private document
               under Exemption 7(C) is warranted must turn
               on the nature of the requested document and
               its relationship to "the basic purpose of the
               Freedom of Information Act 'to open agency
               action to the light of public scrutiny'"
               Department of Air Force v. Rose, 425 U.S.
               [352], 372, 96 S. Ct. [1592], 1604 [(1976)],
               rather than on the particular purpose for
               which the document is being requested.

Reporters Committee, 489 U.S. at 772, 109 S. Ct. at 1481.

Accordingly, "[o]fficial information that sheds light on an

agency's performance of its statutory duties falls squarely

within that statutory purpose.  That purpose, however, is not

fostered by disclosure of information about private citizens that

is accumulated in various government files but that reveals

little or nothing about an agency's own conduct."  Id. at 773,

109 S. Ct. at 1481–82.

          Davin asserts a strong public interest in illuminating

the government's operations and exposing possible misconduct with

regard with to the FBI's investigation of the WAA and Lasser.  We

agree that the information requested by Davin appears to fall

within the statutory purpose of FOIA in informing the citizenry

about "what their government is up to."  Id. at 773, 109 S. Ct.

at 1481 (quoting EPA v. Mink, 410 U.S. 73, 80, 93 S. Ct. 827, 832

(1973) (emphasis in original) (Douglas, J. dissenting)).  The

                                37

district court must determine, however, whether that purpose is fostered by disclosure of the identities of private citizens.

We are cognizant of the government's stated justification for withholding: (1) names and identifying data of non-federal law enforcement officers because "disclosure of their identities would inhibit the cooperation and exchange of information between law enforcement officials and the FBI, and would suppress a vital source of information that the FBI relies upon in order to pursue investigative interests against alleged criminals, suspects or subjects of investigations," App. at 78; and (2) identities of third parties who furnished information to the FBI because disclosure "would seriously impede the FBI's ability to gather future information." App. at 81. We held in McDonnell that "the Government's asserted interest in assuring future cooperation of witnesses with FBI investigations is not a valid reason for refusing to disclose information under Exemption 7(C)." McDonnell, 4 F.3d at 1256. Accordingly, neither the FBI nor the district court may consider this factor in considering the public benefit of withholding the information.

c. Balancing Private and Public Interests

Davin and the government disagree over how to perform the balancing between private and public interests. Davin refers us to our decision in Lame I, where we emphasized that "[t]here can be no question that the 7(C) balancing test must be conducted with regard to each document, because the privacy interest and the interest of the public in disclosure may vary from document

38

to document.  Indeed, these interests may vary from portion to portion of an individual document."  Lame I, 654 F.2d at 923 (footnote omitted).  In that case, we concluded that the FBI's refusal to disclose most of the witness interview transcripts could not be justified under Exemption 7(C), without explaining why the interviews would result in embarrassment or harassment either to the individuals interviewed or to third parties.  Id. at 928.

The government, in contrast, notes that the Supreme Court in Reporters Committee permitted agencies to exempt certain records categorically, as opposed to on a document-by-document basis.  In Reporters Committee, the Court stated that "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction," 489 U.S. at 776, 109 S. Ct. at 1483, and concluded that "rap sheet" information is categorically exempt under § 522(b)(7)(C) because the release of such information always constitutes an unwarranted invasion of privacy.  Id. at 780, 109 S. Ct. at 1485.

While we believe that in the usual circumstance, an individual's privacy interest in not having his or her identity revealed in the context of a criminal or national security investigation overrides the public benefit, we will refrain from extending Reporters Committee to require a per se rule.  We similarly did not apply the categorical balancing approach in Landano, when we determined that FBI informants and agents had a privacy interest in not having their names disclosed in

39

connection with a criminal investigation, which outweighed the asserted public interest (not recognized by FOIA) in discovering wrongdoing by a state agency. Landano, 956 F.2d at 430-31.

Accordingly, while we do not comment on the proper result of the balancing in this matter, we find it important to note that the government must conduct a document by document fact-specific balancing. Agent Moran dispatched all of the 7(C) exemptions claimed in the 9,270 pages withheld by stating that in each instance where information was withheld:

> it was determined that individual privacy interests were not outweighed by any public interest. When the documents at issue were reviewed . . . the passage of time and any effect on the third party privacy interests were considered. It was determined that the privacy interests are stronger now than they were when the records were created. To reveal names in the context of these records could reasonably be expected, due to the type of the investigation to put the lives of individuals in danger, cause embarrassment and humiliation, and would therefore, be an unwarranted invasion of privacy. The disclosure of this information would not contribute significantly to the public's understanding of the operations or activities of the Government.

App. at 75. This explanation stands in stark contrast to McDonnell, where "[t]he Government set forth in an affidavit specific reasons why these persons have a privacy interest in nondisclosure of their identities." McDonnell, 4 F.3d at 1255. Agent Moran's affidavit and testimony, and consequently, the district court's findings, did not link the (b)(7)(C) exemption to any of the individual documents. On remand, the government

40

must provide the district court with a more detailed balancing effort.

## 2. § 552(b)(7)(D)

Exemption 7(D) excepts from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production:

> could reasonably be expected to disclose the identity of a confidential source, . . . which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). See also McDonnell, 4 F.3d at 1257.

The Supreme Court recently set forth the standards for withholding a document under Exemption 7(D) in Landano. The Supreme Court explained that a source is considered a "confidential source" only "if the source `provided information under an express assurance of confidentiality or in circumstances from which such an assurance could reasonably be inferred.'" Landano, __ U.S. at __, 113 S. Ct. at 2019-20 (quoting H.R. Conf. Rep. No. 1200, 93rd Cong., 2d Sess. 13 (1974), reprinted in 1974 U.S.C.C.A.N. 6285, 6291.

The government asserts that eight categories of information pertinent to Davin's request fall under Exemption 7(D): (1) internal source symbols and code names assigned to confidential informants; (2) internal symbol numbers which

41

pertained to informants; (3) information provided by sources under an express promise of confidentiality; (4) temporary source symbols; (5) names and identifying data of third parties who provided information and were interviewed under an implied promise of confidentiality; (6) information supplied by institutions under an implied promise of confidentiality; (7) identities of non-federal law enforcement officers who provided information under an implied promise of confidentiality; and (8) information provided by local or state bureaus or agencies under an implied promise of confidentiality.

In Landano, the Supreme Court reemphasized that the government bears the burden of establishing that Exemption 7(D) applies. Landano, __ U.S. at __, 113 S. Ct. at 2019. The Court embarked on its discussion of implied assurances of confidentiality after noting that the FBI in that case could not attempt to demonstrate that it made explicit promises of confidentiality, because "[t]hat sort of proof apparently often is not possible: The FBI does not have a policy of discussing confidentiality with every source, and when such discussions do occur, agents do not always document them." Id. at __, 113 S. Ct. at 2020. We glean from these remarks that if an agency attempts to withhold information under Exemption 7(D) by express assurances of confidentiality, the agency is required to come forward with probative evidence that the source did in fact receive an express grant of confidentiality. Proof could take the form of declarations from the agents who extended the express grants of confidentiality, contemporaneous documents from the FBI

42

files reflecting the express grants of confidentiality, evidence of a consistent policy of expressly granting confidentiality to certain designated sources during the relevant time period, or other such evidence that comports with the Federal Rules of Evidence.

Rather than provide such proof, the government submits Agent Moran's declaration that asserts an alleged policy of the FBI to grant express assurances of confidentiality on a routine basis.[5]  The declaration fails to cite any written policy or

---

[5]Agent Moran stated in his declaration:

> Exemption (b)(7)(D) was asserted to withhold information received from a source under an express promise that it would be held in confidence, as well as information that could lead to the source's identity.  These sources are symbol numbered sources, code name sources, or individuals who specifically requested confidentiality . . . .
> As a matter of policy and practice, all symbol numbered informants or code names sources are given express assurances of confidentiality.  Illustrative of this express assurance of confidentiality is the manner in which such information is treated within the FBI.  The identities of such sources are not referred to by the true name in any FBI document which records the information they furnished.  The identities of these sources are known to very few FBI employees and are available only on a "need to know" basis.  These special precautions are needed because of the sensitive nature of the information being provided and harm that may befall these sources if their identities were revealed.  The manner in which the FBI actually obtains information from these sources is also demonstrative of the express assurance of confidentiality under which it is received.  The information is received only under conditions which guarantee the

43

provide any assurance that the alleged policy has been applied consistently over the years, and in this specific case. There is no proof that these particular sources received express grants of confidentiality.

The government argues that we indicated in McDonnell that courts may rely upon agency declarations in determining whether a source has received an express assurance of confidentiality. McDonnell, 4 F.3d at 1258. In that case, we held that the district court did not err in adopting the magistrate judge's conclusion that the identity of and information provided by two specific sources were exempt from disclosure under (b)(7)(D) when the declaration stated one source was given express assurance of confidentiality and the other source was assigned a symbol source number and was never referred to by name in the file. Id. The government also cites Wiener, 943 F.2d at 986, where the Court of Appeals for the Ninth Circuit held that the FBI "need only establish the informant was told his name would be held in confidence."

These holdings do not support the government's assertion that it has sufficiently established that sources received express grants of confidentiality. In McDonnell, the agent provided information regarding the circumstances

---

contact will not be jeopardized. Derivative ensuing investigations attributable to a symbol numbered source have also been denied as disclosure of such would reveal the identity of the source.

App. at 87-88.

44

surrounding the interviews in which express grants of confidentiality were given to the two specific sources in question.  McDonnell, 4 F.3d at 1257-58.[6]  No such specifics are provided in the Moran declaration in this case.  Furthermore, while the Wiener court required the FBI to "establish the informant was told his name would be held in confidence," the FBI has failed to do so in this case since the government did not present any evidence of its alleged policy or any evidence that an express grant of confidentiality was in fact given to any particular source.

On remand, the government, if it pursues an exception for express promises of confidentiality, must produce evidence of

---

[6]In McDonnell, we held that the district court did not err in adopting the magistrate judge's conclusion that the identity of a certain source was exempt from disclosure under Exemption 7(D), when, based on Agent Llewellyn's declaration, the magistrate judge "determined that the Government gave an express assurance of confidentiality to an informant named in the files . . . . The identity of this source was considered so sensitive that he or she was assigned a symbol source number and was never referred to by name in the file."  McDonnell, 4 F.3d at 1258.  While these statements may appear to imply that the FBI only pointed to its symbol source number policy to show that the sources received express grants of confidentiality, it is clear from reading McDonnell that the agent's declaration in fact provided detailed information regarding the circumstances of the express grants of confidentiality to the two specific sources involved in the investigation.  We wrote: "At oral argument on the parties' cross-motions for summary judgment, the magistrate judge ordered the FBI to submit a declaration regarding the circumstances surrounding the interviews of third parties who were members of the public.  This order was in response to two letters McDonnell has submitted from interviewees stating that they had not received either express or implied assurances of confidentiality when the FBI interviewed them."  Id. at 1257 (emphasis added). In response to this directive, the FBI submitted Agent Llewellyn's declaration, which presumably, fulfilled the magistrate judge's order.

its alleged policy and practice of giving all symbol numbered informants or code name sources express assurances of confidentiality, evidence that the policy was in force throughout the forty years spanned by the documents at issue, and evidence that the policy was applied to each of the separate investigations and in each case in which a document or portion has been withheld.

In addition to claiming that sources were given express promises of confidentiality, the government also asserts that some sources gave the FBI information under "an implied promise of confidentiality." App. at 89. In Landano, the Supreme Court explained that:

> the Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation.
>
> More narrowly defined circumstances however, can provide a basis for inferring confidentiality. For example, when circumstances such as the nature of the crime investigated and the witness' relation to it support an inference of confidentiality, the Government is entitled to a presumption.

Landano, __ U.S. at __, 113 S. Ct. at 2024. In that case, the Court noted, but did not decide, that the sources at issue who were witnesses to a gang-related shooting of a police officer, might well be presumed to have spoken to the FBI on condition of anonymity based on the circumstances under which they gave their information. Id. at __, 113 S. Ct. at 2023.

46

Moran indicated that all the persons who provided information under an implied promise of confidentiality were individuals who "were past or present members of the WAA; individuals who, through their employment, were in a position to provide detailed information; or private citizens who attended WAA meetings." App. at 90. In its brief, the government asserts:

> [T]he Alliance was suspected of being a Communist front and engaging in seditious activities. Given the nature of the activities alleged, it could be presumed that the Alliance would take measures to shield them from law enforcement. Under these circumstances, sources of insider information operated under an implied assurance of confidentiality. The same holds true for individuals who reported matters discussed at Workers Alliance meetings. The Alliance had various chapters or branches located throughout the country. Individuals who attended meetings and then reported to the FBI also did so under an implicit grant of confidentiality. These individuals were exposed to the risk of retaliation by reporting on Alliance business to the FBI, particularly if they were known to other members of the local branch. In short, sources providing detailed information concerning the extent of Communist control of labor organization and possible treasonous activities of that organization would have been concerned "that exposure would bring harassment, ridicule or retaliation." Keys v. Dep't of Justice, 830 F.2d [337,] 345-46 [(D.C. Cir. 1987)].

Government's Brief at 41-42.

We do not believe that this recitation sufficiently describes circumstances that can provide a basis for inferring confidentiality. The FBI has not offered evidence that any

47

member of the WAA engaged in acts of violence or harassment, or threatened to do so.  In light of the fact the government has access to documents concerning the WAA spanning a period of forty years, we assume that the government would be able to provide examples illustrating its contention that the sources allegedly were afraid of other WAA members.  The government's citation to Keys for the proposition that the sources sought implied assurances of confidentiality actually emphasizes the distinction between the circumstances of the two cases:  Keys involved a murder investigation by a foreign operative in which a source would have good reason to be afraid "lest he meet the same fate." Keys, 830 F.2d at 346.

The government has provided the court with generalized allegations that the WAA was suspected of "being a Communist front" and "engaging in seditious activities."  In attempting to prove that the sources received an implied promise of confidentiality, the FBI relies heavily on the presumption that people who speak to the FBI necessarily require confidentiality. App. at 90-91.  The Supreme Court rejected such a presumption in Landano. __ U.S. at __, 113 S. Ct. at 2022.

Recently in McDonnell, we were faced with a requester seeking documents concerning information supplied by an alleged confidential source regarding involvement of "a suspicious or radical" member of the crew of a ship, who the FBI suspected was involved with a suspicious fire aboard the ship.  McDonnell, 4 F.3d at 1258.  The government asserted that the information was exempt because these circumstances established that the source

48

gave his information under an implied promise of confidentiality. Id. We held that the government did not meet it burden under Landano and remanded for further proceedings consistent with principles articulated by the Supreme Court. In the case at hand, the FBI has not even shown that the persons being investigated were suspected of involvement in violent acts. Accordingly, as we held in McDonnell, 4 F.3d at 1262, on remand, the government must provide a further detailed factual recitation in order to sustain its burden of showing circumstances that provide a basis for inferring confidentiality.

As an added note, we mention the last clause of §552(b)(7)(D), which exempts from disclosure the information that a confidential source provides in a criminal or national security investigation. While not directly before us on this appeal, we do not foreclose the possibility that the FBI could withhold more information than is justified to protect the identity of confidential sources, assuming, of course, the government adequately demonstrates that the information relates to a criminal or national security investigation.

### 3. § 552(b)(7)(E)

The FBI has withheld documents and portions of documents under Exemption 7(E), which allows an agency to withhold records and information for law enforcement purposes that "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. §552(b)(7)(E). Exemption 7(E) applies to law enforcement records

which, if disclosed, would risk circumvention of the law.  PHE, Inc. v. Department of Justice, 983 F.2d 248, 249-50 (D.C. Cir. 1993).  This exemption, however, may not be asserted to withhold "routine techniques and procedures already well-known to the public, such as ballistic tests, fingerprinting, and other scientific tests commonly known."  Ferri, 645 F.2d at 1224 (citing H.R. Conf. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974), reprinted in 1974 U.S.C.C.A.N. 6285, 6291).

The government asserted this exemption, claiming the techniques utilized yielded valuable information, and the disclosure of certain information "would reveal the type of effective investigative techniques and the relative utility of these techniques could be diminished."  App. at 95.  The government argues that despite the fact that certain law enforcement techniques, such as the use of informants, may be well known to the public, disclosure is nevertheless not warranted where the circumstances surrounding the usefulness of these techniques is not well known.  According to the government, "the manner in which informants are identified, recruited, cultivated and handled by the FBI is not well-known," which is especially true where, as here, "the FBI is investigating an organization which is believed to be engaging in illegal activities and has taken measures to shield such subversive activities from law enforcement."  Government Brief at 43.  The government maintains that groups who are suspected of criminal wrongdoing today may be provided with information as to how the FBI recruits internal informants, which may aid the groups in

50

detecting informants currently operating within their ranks. Id. at 43-44.

The government has not offered any proof of these assertions. If the government wishes to argue that the information concerning the use of informants in the 1930's is of such a specialized nature that it is still unknown to the public, the government must introduce evidence of that fact. Moreover, if the government submits evidence that specific documents it has withheld contain secret information about techniques for recruiting informants, it will have to establish that the release of this information would risk circumvention of the law. The speculation provided in the government's brief of political groups' increased ability to detect informants within their ranks is not supported by evidence. Accordingly, on remand, the government must provide the district court with additional facts to support exempted documents and portions of documents under Exemption 7(E).

V.

Last, the government asserts that information was exempt from disclosure under 5 U.S.C. § 552(b)(2), which applies to matters pertaining solely to the internal personnel rules and practices of an agency. This exemption pertains to "routine matters" of "merely internal significance" in which the public lacks any substantial interest. Department of the Air Force v. Rose, 425 U.S. 352, 369-70, 96 S. Ct. 1592, 1603 (1976). The materials claimed to fall within the (b)(2) exemption include the

51

following categories of information: (1) permanent source symbols or code names assigned to confidential informants; (2) the file numbers of permanent symbol numbered sources, (3) temporary source symbols; and (4) administrative data, practices and procedures. App. at 71-74.

> Agent Moran claimed in his declaration that: Information relative to matters of purely internal, bureaucratic significance has been withheld in certain documents as it pertains to the administrative handling of purely internal functions and policies of the FBI. The information is not of obvious importance in itself; but, if it were released to plaintiff and combines with other known data, in a "mosaic" analysis, it could lead to identification of substantive information in the file which has been withheld pursuant to other 5 U.S.C. 552 exemptions. Disclosure of this type of information would not add to the public's understanding of the inner workings of the Government.
>
> Information has also been deleted from a sample document which relates to FBIHQ instructions to a field office concerning agency business. This material relates to procedures and practices to be followed to effectively support investigative efforts.

App. at 74.

The government argues that informant codes fall within the ambit of Exemption (b)(2). We agree. As the Court of Appeals for the District of Columbia Circuit has noted, "[t]he means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest." Lesar v. United States Dep't of

52

<u>Justice</u>, 636 F.2d 472, 485-86 (D.C. Cir. 1980);  <u>see</u> <u>also</u> <u>Massey</u> <u>v. FBI</u>, 3 F.3d 620, 622 (2d Cir. 1993).

However, the description given by the Moran declaration provided the district court with no information as to the content of any of the withheld documents or portions of documents. Accordingly, on remand, the government may assert exemptions under (b)(2) if the district court is provided with sufficient factual support for the withholdings.

CONCLUSION

Because the <u>Vaughn</u> affidavit submitted by the government did not include a specific factual recitation linking the documents or portions of documents in question with the claimed FOIA exemptions, the district court was not provided with an adequate factual basis for its determination.  The order of the district court granting summary judgment to the government was inappropriate because the government did not sufficiently "describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption[s]." <u>American Friends</u>, 831 F.2d at 444 (quoting <u>Abbotts</u>, 766 F.2d at 606).  Accordingly, we will remand this matter to the district court for further fact finding[7] and conclusions consistent with the principles articulated in this opinion.

---

[7]Fact finding may take the form of ordering a more detailed supplemental <u>Vaughn</u> index and public affidavits.  <u>See</u>, <u>e.g.</u>, <u>Wiener</u>, 943 F.2d at 979; <u>King</u>, 830 F.3d at 225; <u>Ferri</u>, 645 F.2d at 1225.  If the district court is still concerned that it is

unable to make a responsible de novo determination, it may proceed with in camera review. 5 U.S.C. § 552 (a)(4)(B). We have discussed elsewhere the factors to be considered in deciding whether in camera review is appropriate. See, e.g., Ferri, 645 F.2d at 1225-26; Lame I, 654 F.2d at 921-22.