SAMUEL GRUBER EDUCATION
PROJECT, Plaintiff,

v.

UNITED STATES DEPARTMENT
OF JUSTICE, Defendant.

No. CIV. 90–1912.

United States District Court,
District of Columbia.

March 17, 1998.

Alan Dranitzke, Washington, D.C.

Marshall Perlin, New York, NY.

Janice Galli McLeod, Office of Information and Privacy, Department of Justice, Washington, DC.

## ORDER

SPORKIN, District Judge.

The parties having appeared before the Court this date, and upon consideration of the discussions with counsel, and of the entire record, it is by the Court this 17th day of March 1998,

ORDERED that the Report and Recommendation of the Magistrate is ADOPTED with the following modifications:

■ ORDERED that as to the remaining unprocessed subjects, plaintiff is to secure from the Social Security Administration by subpoena, records, if they exist, that establish the death for the remaining unprocessed subjects of plaintiff's requests. Plaintiff is to secure these records from the Social Security Administration on or before March 27, 1998. Social Security Administration is to contact plaintiff's counsel if it is unable to comply by this date. Plaintiff shall thereafter transmit a copy of the Social Security records to defendant within one business day of its receipt of the records; and, it is further

ORDERED that for those remaining unprocessed subjects for whom plaintiff has established death as provided above, and including those proofs-of-death which have been submitted directly to defendant by plaintiff, defendant shall promptly process the records for those subjects as part of this litigation; and, it is further

■ ORDERED that plaintiff is granted a 70 percent fee waiver for those records which have been processed; and, it is further

ORDERED that defendant shall refund to plaintiff by United States Treasury check 70 percent of the monies paid for duplication, that is, $3036.46; and it is further

ORDERED that defendant shall produce an adequate *Vaughn* Index of those records that comprised the sample selected by plaintiff, within 30 days from this date. Pursuant to an agreement of the parties, defendant is not required to provide additional justification for the withholding of the names of FBI agents, other FBI employees, codes names or aliases, permanent source symbol numbers, and the file numbers of numbered sources.

### REPORT AND RECOMMENDATION ON DISPOSITIVE MOTION

FACCIOLA, United States Magistrate Judge.

This is a Freedom of Information Act ("FOIA") case. Plaintiff is a not-for-profit, educational, unincorporated association which states as its purpose the "amassing, analyzing and disseminating for educational purposes and in the public interest information on assaults upon democratic trade unions from 1930 to the present." *Complaint,* ¶ 2. It sought from the Federal Bureau of Investigation ("FBI"), "all files and records" pertaining to the FBI's investigation of the United Electrical Radio and Machine Workers of America ("UE") in the middle part of this century. *Complaint,* Exhibit [hereinafter "Ex."] 2.

Plaintiff submitted his original FOIA request on September 20, 1988. After some unsuccessful administrative appeals, he brought this action on August 10, 1990. The case was originally assigned to District Judge Gerhard Gesell of this Court, but was reassigned to District Judge Stanley Sporkin in 1994. He provisionally dismissed the case in May 1995, but permitted its re-opening for the filing of dispositive motions. The parties filed cross motions in January and May 1997. Defendant filed *Defendant's Motion for Summary Judgment* and supporting memorandum. This motion includes the declarations of Robert Moran [hereinafter "Moran Decl."] and Richard Davidson [hereinafter "Davidson Decl."], which along with a sampling of redacted documents make up the FBI's *Vaughn* index, the *Stipulation Pertaining to Correspondence and Other Matters* [hereinafter "Stip." and exhibits attached thereto "Stip. Ex."],[1] and defendant's *Statement of Material Facts as to Which There is no Genuine Issue.*

Plaintiff filed *Plaintiff's Motion* [hereinafter "Pl. Mot."] which requests relief but does not purport to be a dispositive motion. It asks that the Court order the FBI (1) to file a valid *Vaughn* index, (2) to reimburse to plaintiff fees it paid for copying of the already-released records, and (3) to process files of individual subjects the FBI investigated for whom, the defendant contends, plaintiff did not submit sufficient proof of death to overcome personal privacy exemptions in the FOIA. Plaintiff also seeks to reserve time for further discovery if the new *Vaughn* index is not sufficient. In support of its motion, plaintiff filed the declaration of

---

1. The parties were asked to re-submit the Stipulation because it was not found in the file.

Marshall Perlin, counsel for the plaintiff, and a memorandum in support. In opposition to defendant's motion for summary judgment, plaintiff filed *Plaintiff's Statement of Genuine Issues and Material Facts Necessary to be Litigated Pursuant to Local Rule 108(h)* and a memorandum in opposition.

Thereafter, defendant filed *Defendant's Memorandum of Points and Authorities in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and in Opposition to "Plaintiff's Motion"* [hereinafter "Def. Reply and Opp."].

On November 26, 1997, the Court contacted the parties for an informal status by conference call. During that call, the parties were asked to submit to chambers information on the issues raised by the parties' motions. These submissions included (1) letters outlining plaintiff's position as to the fee waiver and defendant's response,[2] (2) a comprehensive joint chart indicating what information sought by plaintiff is still outstanding,[3] and (3) the first 25 documents as they were delivered to plaintiff in their redacted form. All of these documents are herewith filed with the Court and made part of the record.

After consideration of the aforementioned pleadings and letters, and the entire record in this case, it is the recommendation of the undersigned that the parties' cross motions should be resolved in the following manner: the defendant's motion for summary judgment should be denied and the plaintiff's motion should be granted in part and denied in part. The defendant should be ordered (1) to produce an adequate *Vaughn* index, consistent with this Report and Recommendation, (2) to reimburse the plaintiff for 100% of the copying costs or provide adequate justification of its refusal to do so, consistent with this Report and Recommendation, and (3) to

process some of the individual's unprocessed files as noted in this Report and Recommendation.

## Background

In 1942, the Director of the Federal Bureau of Investigation ("FBI"), J. Edgar Hoover, indicated to the Chief of the Special Defense Unit of the Department of Justice, Lawrence Smith, that confidential sources had reported that the "UE was infiltrated with Communists and controlled by the [Communist Party of the United States]." *Declaration of Robert A. Moran* [hereinafter "Moran Decl."] ¶ 25, *quoting* attached Ex. A. Smith then requested that the FBI initiate an investigation into whether individuals within the UE were acting "in furtherance of the Communist cause." *Id.*, ¶ 26, *quoting* attached Ex. B. The FBI initiated the investigation and Hoover directed all FBI field offices to contact companies and manufacturing plants within their geographical areas to ascertain whether there were any UE locals in those areas and, if so, to investigate any "Communist activities by officers and members of the locals." *Id.*, ¶ 27.

The FBI was certainly true to its mandate. The investigation of the UE went on for 30 years and, while there is some dispute between the parties as to the precise number, there is agreement that over 48,000 documents in the FBI's possession are potentially subject to the FOIA request.

## The FBI's *Vaughn* Index

This case has proceeded in a familiar manner. Over the course of the litigation, the FBI has disclosed some documents, refused to disclose others, and released some with material expurgated. In accordance with the seminal decision in *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), the FBI justified its refusal to release

---

**2.** These letters are (1) from plaintiff to the Court on December 15, 1997, (2) from defendant to the Court on January 12, 1998, (3) from defendant to the plaintiff on January 12, 1998, (4) from plaintiff to the Court on January 19, 1998, and (5) from defendant to the plaintiff on January 28, 1998, [hereinafter "Pl. (or Def.) Letter of _____"].

**3.** Due to disagreement as to what the Court had requested, each party submitted its own cover letter, each dated December 18, 1997 [hereinafter "Pl. (or Def.) Letter of December 18, 1997"]. Defendant provided the comprehensive list which is purported to contain all of plaintiff's and defendant's information. Plaintiff submitted a separate list of only the unprocessed individual's files which differs slightly from defendant's list.

certain documents, or to delete material from the documents it did release, by filing two declarations with its instant motion for summary judgment. Those declarations purport to provide its justification for refusing to release some information by indicating that the withheld material falls within one of the FOIA exemptions found at 5 U.S.C. §§ 552(b)(1)-(9). One declaration is by Richard D. Davidson, a Supervisory Special Agent, who deals only with refusals to produce premised on the exemption for "matters that are: (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A); Davidson Decl. at 2. The second declaration is by Robert A. Moran, a Special Agent, who speaks to all the other exemptions.

The Moran and Davidson declarations are familiar documents to the federal courts. An analysis of the reported decisions indicates that these declarations are commonly used by the FBI in FOIA cases throughout the country. They can be universally used because they are case-specific only in the most narrow sense. For example, Moran describes the general FOIA process, talks briefly about the UE itself and the files pertaining to it or certain named individuals within the FBI's records system, and then, from pages 16 to 54 of his declaration, describes what he calls the "Explanation of Format Utilized for the Justification of Deleted Material." Moran explains that, on each document released, there is a code adjacent to the deleted material. Moran then *directs the reader to match that code* with his explanation of the justification which he sets out in his declaration:

> To determine the pertinent justification for deleted material on each processed document, refer to the document in question, note the coded exemption and number adjacent to the deleted material and then refer to the corresponding coded category listed below.

For example, if (b)(7)(C)–1 appears on the document, the (b)(7)(C) designation refers to the general discussion in the main category of the exemption asserted under the caption "Unwarranted Invasion of Privacy." The subcategory "1" particularizes and describes the specific material deleted, which, in this example, is the name and initials of FBI employees.

Moran Decl., ¶ 45.

Thus, in any given document, where a paragraph has been deleted, there is in the margin, next to the expurgated material, a 2– or 3–digit/letter code. If an entire page of a document has been withheld, there appears in its place a form on which a box or boxes have been checked using the FOIA exemption categories. In that case, another box has been checked which reads "Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you." [4]

An expurgated document may therefore contain a complete first paragraph, a second paragraph from which, for example, names or phrases have been expurgated, and an entirely obliterated third paragraph. In the margin of the second and third paragraphs there will be references by code number, *e.g.*, "b2, b7d," leading the reader back to the Moran declaration to learn what those codes mean and what exemptions are being claimed when they are used.[5]

In this sense, the Moran and Davidson declarations are *abstract documents*. They do not apply the exemption to each document, explaining why, in the context of that individual document, the exemptions apply. Instead, they describe the exemptions as they theoretically apply to any document and invoke them without providing a contextual

---

4. Federal Bureau of Investigation FOIPA Deleted Page Information Sheet found as page 3 of document 1 of first 25 documents released to plaintiff which were requested by chambers and are filed herewith.

5. As that example indicates, there may be more than one code next to an expurgation meaning that the FBI is claiming that the information is protected from disclosure by more than one exemption because, for example, it simultaneously discloses a confidential source, the name of an agent, and unjustifiably invades the personal privacy of some third party.

ratiocination for the deletion or expurgation. For example, if one looks at the document, one does not find on its face a brief summary of why the FBI expurgated the next paragraph because the FBI, for example, states that in the expurgated material there is a listing of the persons who attended a meeting of a union local described as a Communist front and to disclose their names would violate their privacy. Instead, one finds only an expurgated paragraph and the code numbers take one back to the Moran and Davidson declarations that explain generally why disclosure of information which unreasonably invades the personal privacy of third persons is exempt from disclosure under FOIA.

Those declarations therefore do not explain the reason for the expurgation on that particular page. Instead, they describe in general how the FOIA exemption for documents which unnecessarily invade the privacy of certain persons applies in *every* FOIA case where the FBI asserts it. From the expurgation and the code, one learns only why Moran thinks that information which unnecessarily invades the personal privacy of certain persons is not to be disclosed pursuant to a FOIA. One never learns, unless the rest of the document makes it obvious, why Moran thought the *particular* information he expurgated met the personal privacy exemption.

### The FBI Declaration and the Courts

■ A review of many reported FOIA cases indicates that the FBI FOIA approach in this case is used throughout the country and is most familiar to this Court. Writing in 1991, Judge Lamberth said that this "coded" approach was "not without it detractors." *Coleman v. Federal Bureau of Investigation,* 1991 WL 333709 (D.D.C. April 3, 1991). He joined them by condemning the coded approach in that case, finding it inadequate. Caselaw before and after his decision suggests that the judge was being gracious; as the matter now stands, the "coded approach" has been criticized by nearly every court to confront it. Most significantly, two Circuit Courts in decisions rendered after Judge Lamberth's decision, have specifically condemned its use in FOIA cases.

In *Wiener v. Federal Bureau of Investigation,* 943 F.2d 972 (9th Cir.1991), *cert. denied* 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992), a history professor sought FBI records concerning John Lennon, the late member of the Beatles. The description of the FBI's *Vaughn* index used in that case, which appears in the Ninth Circuit's opinion, indicates that it was identical in form to the Moran and Davidson declarations. Like them, it was coded and stated in general terms why a particular FOIA exemption justified the withholding of certain material. That explanation was generic; it described why that exemption applied to certain kinds of information whenever that information appeared in any document. Marveling that the first *Vaughn* index filed by the FBI did not even mention Lennon's name, the Ninth Circuit observed:

> These "boilerplate" explanations were drawn from a "master" response filed by the FBI for many FOIA requests. No effort is made to tailor the explanation to the specific document withheld. Remarkably, in the original *Vaughn* index submitted by the FBI, John Lennon's name does not appear at all. The explanations offered are precisely the sort of "[c]ategorical description[s] of redacted material coupled with categorical indication of anticipated consequences of disclosure" the · D.C. Circuit properly rejected in *King* as "clearly inadequate." *King,* 830 F.2d at 224.[6]

943 F.2d at 978–979.

The Ninth Circuit then gave the FBI detailed instructions as to how it was to comply with its indexing or *"Vaughn"* obligation:

> In revising the *Vaughn* index on remand, the FBI must bear in mind that the purpose of the index is not merely to inform the requester of the agency's conclusion that a particular document is exempt from disclosure under one or more of the statutory exemptions, but to afford the requester an opportunity to intelligently advocate release of the withheld documents and to

---

**6.** The reference is to *King v. Department of Jus-*   *tice,* 830 F.2d 210 (D.C.Cir.1987).

afford the court an opportunity to intelligently judge the contest.

*Id.* at 979.

In *Davin v. United States Department of Justice,* 60 F.3d 1043 (3rd Cir.1995), a scholar sought (as does this plaintiff) FBI records concerning a labor union. Agent Moran submitted the FBI's declaration as he has in this case. He used the same codes he used in this case to claim FOIA exemptions and his approach was as generalized and generic as his approach in this case:

> Moran's declaration listed the FBI Main Files regarding Lasser [head of the union] and the WAA [the union], but did not contain any factual description of the specific documents and portions of the documents withheld. Instead, Special Agent Moran offered generic explanations of the "justification categories" used to encode the *Vaughn* index. No specific index was created to factually link the generic descriptions with the encoded deletions, and the explanations themselves did not refer to Lasser or the WAA or any other fact connected with this action. No attempt was made to provide an individual rationale for the withholding of specific information.

*Id.* at 1047.

The Third Circuit rejected the FBI's contention that the Moran declaration meets its obligation to justify either its expurgation of material from the documents it did produce or its withholding of entire documents. It accepted instead the plaintiff's contention that "such a categorical approach, without the inclusion of specific factual information that correlates the claimed exemptions to the withheld documents, is not a sufficient *Vaughn* index." 60 F.3d at 1050. The Third Circuit condemned the Moran declaration's use of "generic explanations broad enough to apply to any FOIA request. They are not tied to the content of the specific redactions." *Id.* The court stated:

> While the use of the categorical method does not *per se* render a *Vaughn* index inadequate, an agency using justification codes must also include specific factual information concerning the documents withheld and correlate the claimed exemptions

to the withheld documents. *Compare Keys v. United States Dep't of Justice,* 830 F.2d 337, 350 (D.C.Cir.1987) (upholding use of indexing system where "the affidavit placed each document into its historical and investigative context") *with King,* 830 F.2d at 221 (similar coding system found wanting "because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety") *and Wiener v. FBI,* 943 F.2d 972, 978–79 (9th Cir.1991) ("boilerplate" explanations of coded index found inadequate since "[n]o effort is made to tailor the explanation to the specific document withheld"), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992). As the Court of Appeals for the D.C.Circuit warned: "the goal of descriptive accuracy is not to be sacrificed to the niceties of a particular classification scheme." *King,* 830 F.2d at 225. Thus, "a coding system might be employed to indicate applicability of a given response to more than one segment of redacted material," but only "so long as the information supplied remains responsive to each deleted segment without becoming categorical in tenor." *Id.* at 224.

The *Vaughn* index provided by the government affords Davin [the man who filed the FOIA request] little or no meaningful opportunity to argue for release of particular documents. Indeed, the index provides no information about particular documents that might be useful in evaluating the propriety of the decision to withhold. Because of the paucity of factual information related to the district court, the categorical justification codes could not provide a sufficient factual basis from which the district court could make its determination. Accordingly, on the record before us, we hold that the district court could not fulfill its duty of ruling on the applicability of the claimed exemptions on the basis of the coded indexing system utilized by the government for its *Vaughn* index.

*Id.* at 1050–1051.

It is most significant that in ruling as they did, the Ninth and Third Circuits found support for their conclusions in a comparison of

the decisions of the United States Court of Appeals for the District of Columbia Circuit in *Keys v. United States Department of Justice*, 830 F.2d 337 (D.C.Cir.1987) and *King v. United States Department of Justice*, 830 F.2d 210 (D.C.Cir.1987).

In *Keys*, the Court of Appeals, finding function more important than form, approved a coded indexing system, rejecting the contention that the FBI had some obligation to repeat the justification again and again for each expurgation. It approved this kind of coded index finding that "[e]ach exemption was adequately explained by functional categories" and "the affidavit placed each document into its historical and investigative context." *Keys*, 830 F.2d at 350. In reaching the latter conclusion the Court directed the reader to compare its decision, earlier in the same year in *King*, in which it rejected a similar coding system "because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety." *Keys*, 830 F.2d at 350, *quoting King*, 830 F.2d at 221.

In *King*, the Court of Appeals, found that the *Vaughn* affidavit was categorical in nature because it did not correlate the existence of the exemption to the particular matter deleted but discussed only the categories of exemption themselves. It concluded that the "coded commentary supplies little information beyond that which can be gleaned from context." 830 F.2d at 220. The coded index therefore deprived the Court of its desperate need to know the context in which a deletion or expurgation had taken place so that it could fulfill its judicial responsibility to judge the validity of that expurgation. That deprivation therefore rendered the coded *Vaughn* index useless in the truest sense of the word:

> To proceed under the alternate strategy—reading the redacted documents and following the code annotations back to the catalogue provided—illuminates the fundamental deficiency of the index format the

FBI has adopted. Because it is unhelpfully categorical in nature, the coded commentary supplies little information beyond that which can be gleaned from context. Apparently the FBI is of the opinion that, by submitting to the court a reproduction of the redacted file, it is relieved of the obligation of describing withheld material in detail. Utilization of reproductions of material released to supply contextual information about material withheld is clearly permissible, but caution should be exercised in resorting to this method of description. Such a system is only as good as its results, and the vital result must be an adequate representation of context which, when combined with descriptions of deletions, enables *de novo* review of the propriety of withholding. In the present case, the system is inadequate because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety, an impermissible result as long as revelation of the context would not itself harm the national security. Furthermore, a reproduction of the redacted documents can only show the court the context from which an item has been deleted, and context may or may not assist the court in assessing the character of the excised material and the grounds for its deletion. Where it does not, the coded commentary to which the system of annotation leads the court is so general in nature as to be of little or no help.

*Id.* at 220. *Accord Oglesby v. United States Department of the Army*, 79 F.3d 1172, 1178–1184 (D.C.Cir.1996), *Army Times Publishing Company v. Department of the Air Force*, 998 F.2d 1067, 1071 (D.C.Cir.1993); *Schiller v. National Labor Relations Board*, 964 F.2d 1205, 1209 (D.C.Cir.1992). *Compare PHE, Inc. v. Department of Justice*, 983 F.2d 248, 251 (D.C.Cir.1993) *with Quinon v. Federal Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C.Cir.1996).[7]

---

7. *See Washington Post v. United States Department of Defense*, 766 F.Supp. 1, 15 (D.D.C.1991) (*Vaughn* index which did not describe the particular information deleted insufficient); *National Security Archive v. Federal Bureau of Investigation*, 759 F.Supp. 872, 877–878 (D.D.C.1991) (*Vaughn* index sufficient when each segment withheld was particularly described); *Fitzgibbon v. United States Secret Service*, 747 F.Supp. 51, 55 (D.D.C.1990) (same). *Compare Williams v. Federal Bureau of Investigation*, 1991 WL 163757 (D.D.C. August 6, 1991) (Richey, J.) *and Scott v.*

What has now become the near universal condemnation of the coded index becomes most understandable when a judicial officer tries to use it to fulfill his obligation to review the validity of the FBI assertion that a particular exemption justified the expurgation of material from a document. I asked the FBI to provide me with the first 25 documents it released to plaintiff in the precise form in which they were provided to plaintiff. The FBI did so. It was impossible to perform the review using the actual documents and the coded index.

For example, the first document made available to me and to plaintiff, a report entitled "Re: COMMUNIST PARTY IN-FILTRATION IN LABOR UNIONS United Electrical Radio and Machine Workers of America." It was addressed to the Director of the FBI and, in its first two paragraphs, its author states its purpose and which FBI offices will receive copies of it. The next paragraph is obliterated and the code designations ("b7C" and "b7D") are in the margin.

The top of page two, following the obliteration, begins in mid-sentence with the words "to the group." It is therefore impossible to understand the sentence which begins with those words or the following reference to "it" (whatever that is) "combining with the Socialist Party group." In the remainder of this paragraph, a word or words have been deleted, the context suggests a person's name has been obliterated.

The next paragraph begins with an obliteration and recounts the background of the decision of the American Federation of Labor not to issue an international charter to the Radio and Allied Trades Council. The next two paragraphs are obliterated as is the entire next page, page three of the document. Ninety percent of the next page, page 4, is obliterated and the document ends with the author indicating that he is forwarding the report to the officers for whatever action they deem appropriate.

As noted, each of the obliterations is coded in the margin to a subsection of FOIA. On this document, the obliterations on page 1 are coded "b7C" and "b7D." The obliterations on page 2 are coded "b7C-2, -3" and "b7D-4." The FBI has attached to the entire page deleted, page 3 of the report, a form on which the FBI has checked the codes "(b)(7)(C)" and "(b)(7)(D)." The obliterations on page 4 are coded "b7C" and "b7D."

The Moran declaration indicates that "b(7)(C)" is the code for material deleted because its release could reasonably be expected to constitute an unwarranted invasion of privacy and is therefore exempt under FOIA. 5 U.S.C. § 552(b)(7)(C).[8] Moran explains that in making the determination that an invasion of privacy was unwarranted, the FBI balanced the public interest in disclosure against the right of personal privacy of third party individuals and concluded that there was no public interest in the disclosure of "personal information about third party individuals" because its disclosure would not "enlighten the public regarding FBI operations and activities." Moran Decl., ¶ 61.[9]

The (b)(7)(D) exemption applies to records or information compiled for law enforcement purposes but only to the extent that their production would disclose information which would reasonably be expected to disclose the identity of a confidential source. Moran Decl., ¶ 77. *See* 5 U.S.C. § 552(b)(7)(D).[10]

---

*United States Central Intelligence Agency,* 916 F.Supp. 42, 47–48 (D.D.C.1996) (Richey, J.) *with Canning v. United States Department of Justice,* 848 F.Supp. 1037 (D.D.C.1994) (Richey, J.).

**8.** According to Moran, the (b)(7)(C) exemption is further subdivided into the following categories: (1) Names and Initials of FBI Agents and Support Personnel; (2) Identities or Personal Information Concerning Third Party Individuals Mentioned in the Files; (3) Identities and Personal Information Concerning Confidential Sources; (4) Individuals Who Furnished Information to the FBI as a Result of Their Employment; (5) Identities on Non-federal Law Enforcement Offi-

cers Who Provided Information to the FBI; and (6) Identities and Personal Information Concerning Third Party Individuals Who Were of Investigative Interest to the FBI. Moran Decl., ¶ 46.

**9.** Moran also indicates that the FBI did not assert the exemption as to people known to be dead. *Id.*

**10.** This exemption is also subdivided into the following categories: (1) Permanent Source symbols; (2) Temporary source symbol; (3) File numbers of permanent symbol number sources; (4) Identities of and information provided by confidential sources under an expressed assur-

Thus, on the first page of the document, the broader categories of (b)(7)(C) (privacy) and (b)(7)(D) (confidential source) are used to justify the obliteration and those same categories are used to justify the deletion of the entire third page. On the second page, the narrower categories of (b)(7)(C)–2 (personal information or identities of 3rd parties mentioned in the files) and (b)(7)(C)–3 (Identities and Personal Information Concerning Confidential Sources) and (b)(7)(D)–4 (Identities of and information provided by confidential sources under an expressed assurance of confidentiality) have been used.

When one applies the codes to the documents and attempts to understand why the deletions were made, the deficiency in this coded approach, condemned in the *King* case, becomes manifest. It is impossible to review the validity of the claimed exemption because the Court is not provided with any information upon which to premise that review.[11] While the Moran declaration describes in general the necessity of protecting confidential sources and the privacy of persons named in the documents, it is impossible to ascertain how the person who deleted the material made the determination that the exemption applied. Except for deletions of a word or words which are obvious from the context, the Court is left to approve blindly the determination of the expurgator that the exemption applied. The FBI never provides the context of the expurgation so that by looking at the document, the Court can understand the expurgator's reasoning. The expurgator never indicates that material has been deleted because the report, for example, discusses attendance at a local Communist Party meeting based on information by an attendee who was a confidential source or why providing the information about the meeting will necessarily disclose his identity and violate the personal privacy of the other attendees. Instead, the expurgator has obliterated a paragraph of text and said that he did so because the FBI considers doing so justified by its interpretation of one or more FOIA exemptions. It is simply impossible to follow the expurgator's reasoning because he has not provided it, nor has he provided a context from which it could be deduced.

The problem becomes *reductio ad absurdum* when the FBI deletes an entire page and checks two boxes on a form claiming two FOIA exemptions. With all due respect to the Department of Justice, it is fatuous to say that a judge is performing the *de novo* review FOIA requires[12] when the judge is staring at a blank piece of paper. The attached form, denoting code numbers, which is cross-referenced to a declaration that merely explains the FBI's understanding of a particular FOIA exemption whenever it invokes it, is no help at all when the judge is provided with no contextual explanation of why that exemption applies to the missing page.

I therefore conclude that, as the cases discussed have held, the declarations provided are insufficient *Vaughn* indices and the defendant's motion for summary judgment must be denied. *PHE, Inc. v. Department of Justice*, 983 F.2d 248, 250 (D.C.Cir.1993) (summary judgment must be denied if agency provides inadequate *Vaughn* index).

---

ance of confidentiality; (5) Identities of and information provided by law enforcement agencies under an expressed assurance of confidentiality; (6) Identities of and information provided by financial institutions under an expressed assurance of confidentiality; (7) Identities of and information provided by individuals under an implied assurance of confidentiality; (8) Identities of and information provided by financial institutions under an implied assurance of confidentiality; (9) Identities of and information provided by law enforcement agencies under an implied assurance of confidentiality. Moran Decl., ¶ 46.

**11.** The King Court noted:
We emphasize that our dissatisfaction with the FBI's Exemption 1 showing arises from the character of the Vaughn index tendered. We express no view on the validity of the underlying classification decisions it is intended to justify. Indeed, we are in no position to evaluate those decisions—to ascertain, for example, whether sensitivity of intelligence information withheld has in any respect diminished with the passage of time—for the simple reason that we are not furnished with sufficient information to do so in a meaningful fashion.
*King, supra*, 830 F.2d at 223.

**12.** "In such a case [*i.e.*, a FOIA case] the court shall determine the matter *de novo*, and may examine the contents of such agency records *in camera* ...." 5 U.S.C. § 552(a)(4)(B).

### The Fee Waiver

In its motion, plaintiff moves for waiver of the copying fees associated with its FOIA request. Because it has already paid fees for copying, it seeks a reimbursement of $4,298.80.[13] Pl. Mot. at 2. The FOIA fee waiver standard consists of two elements: fees shall be waived if (1) "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and (2) "it is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The regulations interpreting the FOIA fee waiver standard set out several factors the FBI must consider in deciding whether the fee waiver applicant has met both elements of the statute. 28 C.F.R. § 16.10(d). Plaintiff has attempted to justify his application for a fee waiver throughout the litigation.

Plaintiff's counsel is on the Board of Directors of the Samuel Gruber Education Project. By letter of May 26, 1993, he answered the request of defendant's counsel for an explanation of how the records to be obtained by the FOIA request "would be made available to the public for research and analysis as well as for the publication of studies for the widest possible audience." Stip. Ex. AA. Plaintiff's counsel indicated that one copy of the records would be placed in the UE archives in the Hillman library at the University of Pittsburgh while a second set would be placed in another university library in the New York City area; the Tamiment Labor History Library at New York University was being considered. He also explained that individuals and organizations had already sought, and had been provided, access to the FOIA records that were received and that brochures had been disseminated advertising the existence of the UE FOIA files and their availability. He indicated that the very purpose of FOIA suit was to make the files that were disclosed available to the public. Plaintiff's counsel also had sent to the FBI's counsel declarations from scholars, affiliated with distinguished universities and colleges, attesting to the vital significance of the UE FOIA records in understanding the history of the American labor movement and how scholars, like themselves, would use the material in their research and writing. Stip. Exs. T, U, and V.

During the conference call with the parties on November 26, 1997, I asked counsel for the FBI to ask that her client consider waiving the fees and advising me of its position. The FBI has now done so and produced half a loaf, or more accurately, somewhere between 30% and 95% of a loaf.[14] The FBI took the subdivisions of the UE's FOIA request and treated each of them as a distinct category for fee waiver purposes. The categories were the UE itself, its District Councils, its locals, and 30 named individuals who were UE officers, staff, or were allegedly confidential informants during the investigation. The FBI, without quarreling that the disclosure plaintiff sought otherwise qualified for a fee waiver, as a general matter, declined to waive the fee for the following categories of information:

1. Public source material such as newspaper articles, summaries of news articles and public, court documents.

2. Repetitive information such as documents containing information derived directly from another document.

3. Administrative date or other non-substantive information such as copies of routing slip or envelopes that contain no substantive information and transmittal letters documenting only the fact of transmittal of an attached substantive document.[15]

---

13. Plaintiff also states that the reimbursement should be for $3,865.00. Pl. Letter of December 15, 1997. The Court intends for the recommended disposition to cover whatever amount was actually paid for copying by the plaintiff pursuant to its FOIA request.

14. The FBI submitted its response by letters to the Court and to the plaintiff both dated January 12, 1998. As noted in footnote 2, these letters have been filed.

15. None of these categories of information appear in the regulations as exceptions to the fee waiver if the requester has otherwise met his burden of demonstrating that disclosure is in the public interest and not primarily for commercial interest. 28 C.F.R. § 16.10(d). If the FBI is going to rely on these standards, one wonders

Thus, if there were 100 pages pertaining, for example, to UE local 107, and 30 of them fell within these three categories, but the rest did not, the fee waiver would be only for 70%. If the cost of reproducing these pages was $100, plaintiff would receive $70. No category warranted a 100% fee waiver. Plaintiff will therefore not be receiving as a refund the $4,298.80 it has paid in copying fees, but some amount less than that, calculated by taking the copying charge for each category plaintiff paid and refunding some percentage of it.

The FBI fee waiver cannot be accepted for lack of support in the record for such a determination. The 1986 amendment of the fee waiver provisions of FOIA changed the controlling standard from determining whether the agency's refusal to waive the fee was "arbitrary and capricious" to a more specific one:

Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

5 U.S.C. § 552(a)(4)(A)(iii). Review of the agency's refusal to waive the fees pursuant to this subsection is now *de novo*. 5 U.S.C. § 552(a)(4)(B). *Larson v. Central Intelligence Agency*, 843 F.2d 1481, 1482 (D.C.Cir. 1988); *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir.1987). The agency is obliged to explain its refusal to waive fees. *National Treasury Employees Union v. Griffin*, 811 F.2d 644, 649 (D.C.Cir.1987).

There's the rub. The defendant's letters to the Court and the plaintiff of January 12, 1998, create a problem for the Court similar to the problem created by the Moran and Davidson declarations. There is no way to review the FBI's determination as to the fee

waiver because there is no record upon which to premise it. There is no declaration from any one in the FBI as to how the determination was made and, even if there was, no underlying record upon which to test the validity of that determination because the disqualified records are not before the court in even summary fashion. Without that record, no review is possible, let alone *de novo*, for want of the means to match the standard to the documents to ascertain whether the disqualified material failed to meet either the statutory standard or the standards of the three categories of disqualification the FBI used. Instead, the court must accept on faith that 20% or 30% of a certain group of documents were properly disqualified.

I therefore conclude that the FBI's justification for refusing the fee waiver is insufficient to permit the *de novo* review required. The FBI must either allow a 100% waiver or provide a detailed justification for its refusal, amply supported by reproduction and submission to the Court of the documents which the FBI claims should not qualify and a means by which the number of such documents can be compared to the remainder that did qualify. *See Schrecker v. Department of Justice*, 970 F.Supp. 49 (D.D.C.1997) (ordering FBI to waive FOIA copying because of FBI's failure to produce evidence of disqualification).

### Proof of Death

The FBI refused to search for 18 individual's files,[16] all of whom plaintiff contends are dead, because plaintiff did not provide it with sufficient proof that the subjects of the files are dead. The FBI claims exemptions 6 and (7)(C) of FOIA, which generally exempt documents the disclosure of which constitutes an unwarranted invasion of privacy, require that the plaintiff provide adequate proof of the individuals' deaths and that plaintiff did not do so. Def. Reply and Opp. at 11–12.

why they do not appear in the section of the C.F.R. just cited where the standards to be used are supposedly set forth.

16. It appears that the plaintiff miscalculated the number of unprocessed files. He listed only 17

whereas the defendant listed 18. It is the Court's intention that, if this was plaintiff's inadvertent omission, the 18th file is also subject to the recommended disposition of these motions.

The FBI raised the issue of proof of death at the beginning of the FOIA process; it appears in the early correspondence between plaintiff's counsel and the Chief of the Freedom of Information–Privacy Acts Section Records Management Division of the FBI, Emil Moschella. Stip. Exs. B and E. Plaintiff's counsel began providing dates of birth, dates of death and Social Security numbers where possible, and authorizations of living subjects in an October 17, 1988 letter. Stip. Ex. B. In a November 6, 1989, letter, Moschella informed plaintiff's counsel that the FBI would not process 25 of plaintiff's requested files on individuals because no proof of death or other authorization had been provided. He also spelled out to plaintiff's counsel what types of proof of death were sufficient; he wrote:

> Proof of death can be a copy of a death certificate, obituary, or a recognized reference source. A mere assertion by a requester that an individual is deceased is not sufficient proof of death. In those instances where the date of birth provided indicates that the subject is 100 years old or more and it has been asserted that the subject is deceased, proof of death is not required. An authorization from another individual must be expressly directed to the FBI, must specify the record or type of records to which it applies, and must be notarized, with original of the authorization provided to the FBI.

> . . .

> Without proof of death or a notarized authorization, the disclosure of law enforcement records or information about another private citizen is considered an unwarranted invasion of personal privacy. Such records are exempt from disclosure pursuant to Exemptions 6 and/or 7(c) of the FOIA, 5 U.S.C. Section 552.

Stip. Ex. I. Thus, from the very beginning of the controversy until today, the FBI has imposed the entire burden upon plaintiff of establishing the death of the person who was the subject of a file even though under FOIA the FBI has the burden of proving that withholding information under any of the exemptions is justified. 5 U.S.C. § 552(a)(4)(B); *King, supra,* 830 F.2d at 217. Moreover, the Privacy Act of 1974, 5 U.S.C. § 552a, *et seq.,* does not require such proof. In any event, in this Circuit, records otherwise protected by Privacy Act must be disclosed if required by FOIA. *Greentree v. United States Customs Service,* 674 F.2d 74, 79 (D.C.Cir.1982); *National Association of Atomic Veterans, Inc. v. Director, Defense Nuclear Agency,* 583 F.Supp. 1483, 1488 (D.D.C.1984). Nonetheless, the FBI has consistently and historically insisted that plaintiff has the burden of proving death by only certain proof, and if the proof of death does not meet its standards, the FBI will not process the file.

Plaintiff's counsel is in an unusual position. Unlike the typical academic researcher, he and his law firm represented the national offices of UE for many years and he knew most of the people whose files he sought. Many were his friends or associates. Thus, although he could not meet the FBI's demands of a "death certificate, obituary or recognized reference source," he provided what evidence he had that a certain person was dead, including, on occasion, his own personal knowledge. The FBI, however, stuck to its guns and rejected anything short of a "death certificate, obituary or recognized reference source." [17] It only excepted the situation where the file itself reflected the person's death.

Generally, when the FBI claims that certain information falls under exemptions 6 or 7(C) which prevent invasions of personal pri-

---

**17.** Given that he knew many of the people, the FBI's insistence on a death certificate made plaintiff's counsel more and more frustrated. For example, he wrote as to one of the subjects whose file was later processed:

> In my letter of October 17, 1988, I gave you Mr. Emspak's Social Security number, his date of birth and date of death. Moreover, on August 1, 1989, I submitted to you a letter of authorization from his widow Stella Emspak.

> It is incredible to believe that after Mr. Emspak has been dead for 27 years, a fact about which the FBI has been fully apprized, you still refuse to process the request on the claim that you do not know whether of not he is still alive. Be advised that Mr. Emspak was a client and a personal friend of mine for at least 15 years as of the time of his death.

Stip. Ex. J.

vacy, courts have engaged in a balancing of the privacy interests at stake versus the public interest in disclosure. *United States Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *National Association of Atomic Veterans, Inc., supra,* 583 F.Supp. at 1485. Though not universally settled, it is generally accepted that, when the subject is deceased, the subject's privacy interest no longer exists. *McDonnell v. United States,* 4 F.3d 1227, 1254 (3rd Cir.1993). The question presented, therefore, is who properly bears the burden of proving that a subject is deceased and what should be acceptable proof.

As noted earlier, FOIA imposed the burden of establishing an exemption on the agency claiming it. 5 U.S.C. § 552(a)(4)(B). At least one court has therefore concluded that a district court has discretion to order the FBI to demonstrate that the persons whose privacy it seek to protect are alive:

> [I]t is within the discretion of the district court to require an agency to demonstrate that the individuals upon whose behalf it claims the privacy exemption are, in fact, alive. In exercising it discretion, the district court should consider such factors as the number of named individuals that must be investigated, and the age of the requested records. If the number of individuals is not excessive, the agency could be required to determine whether the individuals are alive before asserting a privacy interest on their behalf.

*Davin v. United States Department of Justice, supra,* 60 F.3d at 1058.

At an October 18, 1990, status hearing before Judge Gesell, the Court addressed the proof of death issue:

> there ought to be a way to clarify this question of whether or not a person is deceased. I've had a good deal of experience with that problem in other cases and it would seem to me that as long as the requester presents in adequate form affidavits by declaration or otherwise, proof of death, then the burden shifts to the FBI to prove the person is alive and the requester should not be required to do more than demonstrate responsibly the death. Now,

obviously an unsworn letter or something of that kind which I don't doubt are in good faith isn't enough to meet the standard. I haven't had a chance to look at the regulation, but ... my understanding is that there ought to be a rather simple way to resolve that part of your controversy....

October 18, 1990, Hearing Transcript at 8. A comparison of the views of the Third Circuit in *Davin* and of Judge Gesell is illuminating. The Third Circuit presumed from the age of the records that the persons named in them were dead and ordered the FBI to search its records unless it could rebut the presumption by establishing that the person was alive. Judge Gesell shifted that burden in the same way but only after convincing proof that the person was dead had been adduced.

The Third Circuit struck the balance between privacy and the demands of a accurate historical record in favor of the latter. That approach presents, however, the risk that some person, still alive, named in the record, will be identified as a Communist or fellow traveler in gross violation of her privacy and without her knowledge or consent. The Gesell view prevents that risk but, by striking the balance in favor of privacy, runs the equally substantial risk of irrationally protecting the privacy of people who are long dead. Additionally, as the history of this case illustrates, the FBI's insistence on certain documentation, and the refusal to accept any thing less, leads to the plaintiff being put in the often impossible position of having to prove a negative.

The controversy will simply not admit of a lapidary judgment. Nevertheless, a court can begin with the proposition that the FBI, as an agency of the federal government, should, at a minimum, be required to use all of its available resources to ascertain whether a person is dead. Therefore, if plaintiff's counsel has provided the name, date of birth and Social Security number of a certain person, the FBI will have to use the resources of the federal government, such as Social Security records, to ascertain whether the person is dead. If it does not or refuses to do so, it will have to turn over the records. If plaintiff's counsel had provided the name and date

of birth of a person, the FBI will have to ascertain whether that person has a Social Security number and, if so, whether that person is dead or alive. If plaintiff's counsel has provided only a name, then the FBI need not process the file, unless plaintiff's counsel provides the FBI with a Social Security number or the FBI itself cannot ascertain that person's Social Security number from all resources available to it.[18]

### Conclusion

Therefore, consistent with this Report and Recommendation, I conclude that the Court should deny defendant's motion for summary judgment for failing to provide the Court and the plaintiff with an adequate *Vaughn* index by which to review the propriety of claiming the exemptions that it does.

Plaintiff's motion should be granted in part and denied in part as follows. First, the Court should order the defendant to provide an adequate *Vaughn* index. Second, the Court should require the defendant to either reimburse the plaintiff for 100% of the copying fees associated with its request or provide specific justification for its refusal to do so. Third, the Court should order the defendant to process the unprocessed individual's files in accordance with this Report and Recommendation. Finally, plaintiff's request for additional time to conduct discovery should be denied without prejudice.

Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

---

18. The Court intends to require the FBI to ascertain from Social Security records the deaths of the 18 individual's files listed as unprocessed in the defendant's submission of the joint comprehensive list submitted pursuant to this Court's request. It appears that as to two individuals, Nicholas Tomasetti and James McLeish, post-litigation proof of death was provided. Those files shall be processed. Likewise, the file of Arthur Strunk, who plaintiff asserts testified in court in 1953 that he was 57 years old, making him 101 years old today, shall be processed in accordance with the FBI's 100–year presumption. Stip. Ex. I. Finally, the Court agrees that it is unfair to "bootstrap" any additional requests after the commencement of this litigation onto plaintiff's original request, Def. Reply and Opp. at 10–11; thus, plaintiff's requests for the files of Charles Newell and James Lerner, Pl. Letter of December 18, 1997, are not subject to this recommendation.